**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 21-CR-691-TSC** |
| **CHRISTIAN MATTHEW MANLEY,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to Defendant's motion (DE 17) to revoke the October 21, 2021 detention order issued by a magistrate judge in the District of Alaska.

On January 6, 2021, Defendant came to the Capitol prepared for violence, wearing a military style tactical vest, and armed with both pepper spray and a collapsible baton.  Defendant joined the mob that invaded the Capitol Grounds and became one of the first to enter the Lower West Terrace Tunnel and attempt to breach the police line to enter the Capitol Building.   While inside the Tunnel, Defendant used repeatedly engaged in violence against the police – first by spraying two cannisters of pepper spray at the police, and throwing them at the police, then by throwing a pole, and then by pushing a door against officers.  Defendant not only presents a danger to the community, but based on his criminal history and his limited community ties, he is a flight risk.  Accordingly, the detention order should be upheld.

### Procedural History

On October 15, 2021, the District Court for the District of Columbia issued an arrest

warrant charging Defendant Christian Matthew Manley with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon or Inflicting Bodily Injury in violation of 18 U.S.C. § 111(a)(1) and (b); Civil Disorder, in violation of 18 U.S.C. § 231; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); two misdemeanor violations of 18 U.S.C. § 1752; and two misdemeanor violations of 40 U.S.C. § 5104 (DE 1).  These charges stemmed from his actions on January 6, 2021, during the timeframe a joint session of the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election.

The same day, Defendant was arrested in the District of Alaska (DE 5).

On October 21, 2021, Defendant appeared before U.S. Magistrate Judge Matthew M. Scoble.  A full detention hearing was conducted, after which Magistrate Judge Scoble ordered Defendant detained, finding by clear and convincing evidence that no combination of release conditions would reasonably assure the safety of the community or would reasonably assure Defendant's appearance as required.  *See* Exhibit 1 (Detention Hearing Transcript), at 51-52.[1]  In reaching this conclusion, Magistrate Judge Scoble noted that unlike the passive observers present that day, Defendant was "right up front, attempting to breach the Capitol,"  *id*. at 47, and that unlike those who were "caught up in the rage of the crowd," Defendant "arrived knowing exactly what he was doing."  *Id*. at 49.  The court noted that Defendant came armed with two cannisters of pepper spray as well as personal protective gear and concluded that Defendant "came to fight."  *Id*. at 50.  Magistrate Judge Scoble found that Defendant's "willingness to resort to violence in an

---

[1] Magistrate Judge Scoble found that a presumption of detention applied.  *Id*. at 46.  The Government submits that this was erroneous, and that no presumption of detention under 18 U.S.C. § 3142(e) applied.  However, because Magistrate Judge Scoble immediately found the presumption had been rebutted, the error played no role in Magistrate Judge Scoble's ultimate determination that detention was appropriate.

attempt to conform the world to his belief systems" weighed heavily in favor of detention. *Id.* at 50-51.   Having noted that Defendant was discharged from the Marines under "other-than-honorable conditions" for criminal activity and that he had minimal ties to the District of Alaska or the District of Columbia, the court also found Defendant's "contempt for the rule of law gives this court no assurance that he would abide by any order this court makes as far as his conditions of release." *Id.* at 51.  Accordingly, the court found Defendant to be a flight risk as well.

On November 19, 2021, a federal grand jury in the District of Columbia returned an eight-count indictment charging Defendant with felony obstruction of law enforcement during a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count 2); Assaulting Certain Officers and Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count 3), three felony counts relating to disorderly conduct and violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752 (Counts 4-6), and two misdemeanor counts relating to disorderly conduct and violence in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2) (Counts 7-8) (DE 6).

On December 20, 2021, Defendant filed a motion (DE 10) seeking a second detention hearing by a magistrate judge in this District.  On December 23, 2021, Magistrate Judge Furuqui denied the motion, holding that Defendant's only avenue for reconsideration of the Detention Order was to appeal to this Court pursuant to 18 U.S.C. § 3145(b).

On January 14, 2021, Defendant filed the instant motion.

## **Applicable Authority**

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "the court having original jurisdiction over the offense." 18 U.S.C.

3

§ 3145(b).  The court's review of the magistrate judge's order of release is *de novo*.  *United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017).  The reviewing court has discretion to call witnesses, review transcripts, or proceed by proffer. *Id.*

If a defendant is eligible for a detention hearing, the Bail Reform Act provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  § 3142(e).

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the court must consider four statutory factors: (1) "the nature and circumstances of the offense  charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).  A finding that a defendant poses a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(e).

## Factual Background

The Government incorporates by reference the statement of facts supporting the complaint in this matter (DE 1).  In pertinent part, Defendant was identified after an individual provided information to the Federal Bureau of Investigation ("FBI") identifying Defendant as an individual in one of the photographs circulated by the FBI for the purpose of identifying individual involved with the January 6 Capitol Riots.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction

4

of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.

Contrary to Defendant's attempt to minimize his conduct as merely "reckless" (DE 17, at 4), the evidence shows Defendant purposefully, and repeatedly, engaged in violence against law enforcement, not only with pepper spray, but also by throwing objects and using his strength and the full weight of his body to press a door against law enforcement officers.  Defendant also assisted other rioters by passing stolen riot shields, and after leaving the tunnel, Defendant encouraged other rioters to engage in violence, waiving them into the tunnel.

By approximately 2:50 p.m., Defendant had made it past the fallen barricades, and through the clouds of tear gas, to arrive at the LWT.  *See* Exhibit 2.[2]  Though no one was attacking him, and the police had already retreated inside the tunnel, Defendant was wielding one of his weapons -- a container of pepper spray -- and was holding it over his head, ready to deploy it.  Defendant

---

[2] Exhibit 2 is an excerpt of a video entitled "Chaos on Capitol Hill" available at https://www.instagram.com/tv/CJwU_qAH4ic/.  Figure A is a screenshot from :02 into the excerpt.

also wore a tactical vest, something usually used by law enforcement or military personnel to protect against ballistics.   Inside that tactical vest, Defendant carried another weapon -- a collapsible baton (a fact which was not discussed during Defendant's detention hearing).



Fig. A

Instead of passively observing, as many rioters were doing, Defendant strode quickly towards the LWT tunnel.  Once inside, he immediately moved forward, towards the MPD and USCP officers defending the entrance to the Capitol.    Less than a minute after his entrance, Defendant sprayed the cannister of pepper spray visible in Figure A over the heads of other rioters and directly at the officers defending the tunnel.   *See* Exhibit 3 at 1:01 – 1:07;[3] Exhibit 4 at :42 - :55.[4]

---

[3] Exhibit 3 is an excerpt of video taken by a camera inside the LWT Tunnel on January 6.  Figure B is a screenshot from 1:02 into the clip.

[4] Exhibit 4 is an excerpt of a publicly available video entitled "Unbelievable footage_Trump Supporters Battle Cops Inside the Capitol" available at https://youtu.be/cJOgGsC0G9U.



Fig. B

After emptying this first cannister, Defendant threw it at the officers.  *See* Ex. 3 at 1:07 - :09

(Figure C); Ex. 4 at :55.



Fig. C

Defendant then moved back towards the entrance to the tunnel, and helped pass stolen police riot

shields back towards other rioters, as he shouted "Let's Go!" to encourage the other rioters.  *See*

Ex. 3 at 1:15 – 1:40 (Figure D); Ex. 4 at 1:00 - 1:26.



Fig. D

Defendant then reentered the tunnel, took out a cellphone, and used it to take photos and/or video.  *See* Ex. 3 at 1:59 – 2:08 (Figure E); Ex. 4 at 1:41 – 1:50.



Fig. E

Defendant then moved deeper into the tunnel, towards the officers.  At approximately 2:54 p.m., Defendant held up another cannister and sprayed its contents at the officers.  *See* Ex. 3 at 2:28 –

2:30 (Figure F); Ex. 4 at 2:16 – 2:18.



Fig. F

Defendant next threw the second pepper spray cannister at the officers.  *See* Ex. 3 at 2:57 (Figure

G); Ex. 4 at 2:43.



Fig. G

Defendant then moved closer to the front line of rioters confronting the officers.  From this

position, Defendant threw another, unidentified, object at the officers.  *See* Ex. 3 at 3:19 -- 3:20

(Figure H).

9



Fig. H

At approximately 2:55 p.m., Defendant took a metal rod from another rioter and threw it at the officers. *See* Ex. 3 at 3:31 (Figure I); Ex. 4 at 3:18.



Fig. I

Next, Defendant again helped carry stolen police riot shields, this time towards the front line of rioters, so they could be used against police. *See* Ex. 3 at 3:35 – 3:54 (Figure J); Ex. 4 at 3:23 – 3:38.



Fig. J

Defendant then joined the other rioters pushing against law enforcement.  *See* Ex. 4 at 3:50 – 4:02.

At approximately 2:57 p.m., the rioters succeeding in pushing the police back to the inner doors of the tunnel.  Defendant moved forwards with the rioters.  After attempting unsuccessfully to grab one of the officer's batons, *see* Ex. 4 at 4:05, Defendant took a position behind the one of the inner doors.  From that position, Defendant first threw his weight against the door, and then braced himself against the wall and used his body to push the door into the officers trying to defend the entrance.  *See* Exhibit 4 at 4:55 - 5:30 (Figure K).



Fig. K

11

At approximately 2:58 p.m., Defendant moved back towards the entrance, apparently having been pepper sprayed. As he moved towards the exit, Defendant wiped his eyes with his hat. See Ex. 3 at 6:50 – 7:00 (Figure L).



Fig. L

As Defendant exited the tunnel, he raised his fist, pointing into the air and shouting "U.S.A." *See* Ex. 3 at 7:09 – 7:12. Defendant then walked down the steps, waiving to other rioters, encouraging them to enter the tunnel to confront law enforcement. *See* Exhibit 5 at :08 to :23 (Figure M).[5]

---

[5] Exhibit 5 is an excerpt from a video entitled "Full Footage: Patriots Storm U.S. Capitol" obtained from YouTube. When the video was obtained, it was publicly available, but it has since been made private. Figure M is a screenshot from :11 into the excerpt.



Fig. M

On October 15, 2021, Defendant was arrested in Anchorage, Alaska.  In contrast to his appearance on January 6, Defendant had shaved his facial hair and had a close-cropped haircut.

After his arrest, Defendant signed a written *Miranda* waiver and agreed to speak with law enforcement.  Among other things, Defendant said he had travelled to Washington, D.C. with members of a group called "La Cantina," who he had been communicating with over Parler and Signal.  Defendant claimed to have led this group's convoy from their meeting place in South Carolina to Washington, D.C., arriving on January 5, 2021.  Defendant admitted that on January 6, 2021, he wore a "flak vest" and carried an extendable baton, handcuffs and bear spray. Defendant said that by the time he arrived at the bottom of the Capitol steps, he could already see tear gas being used.  Defendant admitted to passing police shields back to others and having pepper sprayed law enforcement officers.   Defendant told the FBI that he moved to Alaska in May 2021 in order to be "off the grid" and that he planned on staying in Alaska permanently.

## ARGUMENT

The government respectfully submits that Magistrate Judge Scoble was correct that there are no conditions or combinations of conditions that can effectively ensure the safety of the community or reasonably assure Defendant's appearance as required.

## Nature and Circumstances of the Offenses

The first factor the Court must consider is the nature and circumstances of the offenses charged, "including whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1). The Courts that have addressed the detention or release of the Capitol Riots defendants who engaged in violence have uniformly found that the nature and circumstances of the charged offense weighs in favor of detention.  Here, Defendant's offenses stem not only from his unlawful entry onto the Capitol Grounds during the Riots, but his decision to attack the law enforcement officers defending the entrance to the Capitol Building from rioters who were trying to stop the certification of a Presidential election.

Chief Judge Howell has set forth a number of considerations to differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6.  *See United States v. Chrestman*, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021).  These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses"; (2) "engaged in prior planning before arriving at the Capitol"; (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot"; or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct"; and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged or attempted to damage federal property," "threatened or

confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot." Id. at *7–8.

The *Chrestman* factors put defendant in the most serious category of offenders.   First, Defendant has been charged with multiple serious felonies, including crimes of violence.

Second, Defendant clearly planned for violence on January 6.  He chose to wear a tactical vest, and filled it with at least two cannisters of pepper spray and a collapsible police baton in advance of his arrival at the Capitol.   By his own admission, he carried handcuffs, which could have played no role in a peaceful protest, nor could have been used to defend himself or others. Before heading to Washington, D.C., Defendant told a friend that he was going with a group whose intent was to occupy the Capitol or Capitol Grounds if Congress did not "do what they were supposed to."  And that "if we take the Capitol Building, we take the Capitol Building."[6]

Moreover, in a Parler post from before January 6, Defendant encouraged others to come "armed" to Washington, D.C. on January 6.[7]

---

[6] Reports summarizing FBI interviews with Defendant's friends and a relative have been produced in discovery (redacted to protect identities).

[7] Defendant's Parler post was reprinted by a reporter on January 5, 2021, in an article entitled "How the Insurgent and MAGA Right are Being Welded Together on the Streets of Washington D.C.", available at https://www.bellingcat.com/news/americas/2021/01/05/how-the-insurgent-and-maga-right-are-being-welded-together-on-the-streets-of-washington-d-c/



Third, defendant not only carried a dangerous weapon – the police baton – he carried *and used* two other dangerous weapons – the pepper spray cannisters – on law enforcement officers.

Fourth, Defendant's admission that he travelled to Washington, D.C. with a convoy of others, his social media post encouraging others to come armed, his decision to bring weapons and wear tactical gear, and his statements to a friend that he was travelling with a group that intended to occupy the Capitol or Capitol Grounds, all strongly suggest that Defendant's actions were coordinated in advance. At a minimum, the video evidence shows that on the day, Defendant's attacks were not made in isolation. They were done in conjunction with other rioters, magnifying their chance of success and increasing the chances that other rioters' attacks would succeed.

Fifth, by placing himself at the front line of rioters before his attacks, Defendant took a leading role relative to the rioters merely cheering on the violence. Defendant provided an example for others, and after his attacks, he specifically encouraged more violence by waiving other rioters forward to enter the tunnel. *See Chrestman*, at *15 ("He not only violated the law himself, but encouraged others to engage in unlawful conduct").

The final *Chrestman* factor – the nature of defendant's words and movements during the riot – also puts Defendant among the most serious offenders because his repeated assaults distinguish him from those who refrained from violence. In *United States v. Munchel*, 991 F.3d

1273 (D.C. Cir. 2021), the D.C. Circuit made clear that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id*. at 1284. "In so holding, *Munchel* drew categorical distinctions between the violent and non-violent January 6 participants explaining that the former are categorically more dangerous." *United States v. Fairlamb*, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).

In sum, Defendant's planning for violence before January 6, and willingness to engage in repeated violence on January 6, put him in the most dangerous category of offenders carved out by *Munchel* and *Chrestman*. The intent and result of Defendant's conduct was to disrupt the peaceful and orderly transition of presidential power using violence. The nature and circumstances of Defendant's offenses show a clear disregard for the law, an aversion to the fundamental tenets of democracy, and a willingness to act violently, all of which indicate that he poses a danger to the community.

### Weight of the Evidence

The second factor also clearly weighs in favor of detention. The evidence against the defendant is overwhelming. As discussed above, Defendant's actions were captured on video, and while Defendant significantly minimized his conduct, he has admitted to law enforcement that he was at the Capitol, carried weapons, and pepper sprayed officers.

### Defendant's History and Characteristics

Under the third factor, the Court must consider defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record

concerning appearance at court proceedings," 18 U.S.C. § 3142(g)(3)(A); and "whether, at the time of the current offense or arrest, [defendant] was on probation, on parole, or on other release, *Id.* § 3142(g)(3)(B). With due respect to Magistrate Judge Scoble's finding that this factor was "more equivocal," (Exhibit 1, at 48) the government submits that this factor weighs clearly in favor of detention.

As an initial matter, according to the pre-trial services report prepared in Anchorage, Defendant has a history of alcohol abuse and uses marijuana daily.

Contrary to Defendant's claim that his conduct on January 6 was an aberration, Defendant has a history of criminal conduct which includes an assault conspiracy charge, probation violations and violations of military orders. In addition to a 2017 conviction for DWI, a March 2019 probation violation and a June 2019 probation violation, Defendant has military criminal convictions for Conspiracy to Commit Assault Consummated by a Battery, Violation of a Lawful Order, and a violation of U.C.M.J. Article 107 (Making a False Official Statement). As a result of his misconduct, Defendant received an "Other than Honorable" discharge due to serious misconduct. Exhibit 1, at 48.

As Magistrate Judge Scoble noted, Defendant's conduct on January 6 demonstrated a "contempt for the rule of law" which, like his prior criminal conduct, his violation of military orders, and his probation violation, raises significant doubt that he would abide by any conditions of release. *See Sabol,* at *15 ("That [the defendant] acted violently against law enforcement protecting the peaceful transition of power based on a belief that the 2020 Presidential Election was stolen is also very alarming [and] indeed raises concerns about [his] character and the danger [he] may present to the community if he were released."). Such a motivation shows defendant's "inability (or refusal) to exercise his independent judgment and conform his behavior to the law"

18

*United States v. Chansley*, 2021 WL 861079 (D.D.C. March 8, 2021) at *10.

Finally, Defendant's statements before January 6 and his conduct on January 6 demonstrates that Defendant believes his political beliefs justified his violence. While Defendant is free to believe whatever he wants, there is no evidence defendant has renounced those beliefs or the information sources which he thinks justified his violence. Therefore, the threat of further violence from Defendant is "present, concrete, and continuing." *See United States v. Sabol,* 2021 WL 1405945, at *18 (D.D.C. Apr. 14, 2021).

Defendant's history and character thus weigh in favor of detention.

## **Nature and Seriousness of the Danger**

The final factor is the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Defendant's conduct in this case—assaulting police officers in an effort to undermine a presidential election—shows a disregard for the safety of others, the rule of law, and the democratic process. Indeed, "if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." *United States v. Fairlamb*, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).

"It cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community." *Munchel*, 991 F.3d at 1284–85. In *Munchel*, the D.C. Circuit remarked that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id.* at 1284. Defendant's actions on January 6 place in him

unambiguously into *Munchel*'s more dangerous category and provide clear and convincing evidence that he "poses a concrete, prospective threat to public safety." *Id*. at 1280.  *See also* Judgment, *United States v. Worrell*, 21-3020 (D.C. Cir. May 5, 2021) [Doc. No. 1897399] (affirming district court denial of reconsideration of detention, in part because the district court found that the defendant "actually assaulted police officers," citing *Munchel*).

### Defendant Presents a Risk of Flight

Magistrate Judge Scoble was also correct to find that Defendant presents a risk of flight. First, Defendant has no strong ties to any community.   While Defendant asks to be permitted to live with his grandparents in Athens, Alabama, it is questionable how strong his ties to that community are, given that Defendant admitted to the FBI that he moved to Alaska in order to "be off the grid" and intended to live there permanently, despite his lack of connections to Alaska. According to a LexisNexis Accurint search conducted by Probation in Alaska showed that Defendant has lived in 15 different residences since 2014.  Though Defendant apparently rented a hotel room in California from December 2020 to March 2021, the FBI interviewed a friend who stated that Defendant was living with him in Alabama during that period.  Another friend described Defendant as a "nomad or hippy who does not stay put in one place for long."

Defendant has no fixed employment, working as an independent contractor and only since August 2021 has he taken work as a commercial fisherman in Alaska.  Defendant has no ties whatsoever to the District of Columbia, where he committed his crimes.

As Magistrate Judge Scoble found, Defendant's actions on January 6 demonstrate a disregard for the rule of law, making it unlikely he can be expected to comply with any conditions of release this Court might set.

Defendant's conduct after January 6 also raises concerns.   Defendant changed his

appearance after January 6, shaving his beard and cutting his hair.  According to friends and a relative, Defendant replaced his cellphone within a few days after January 6 – a phone which not only could help prove his presence at the riots, but which also contained photographic evidence he took while inside the LWT Tunnel.  Thereafter, Defendant moved to Alaska to "get off the grid."  All of this evidence suggests an effort to destroy evidence and avoid detection by law enforcement.

Defendant has a very strong motive to stay "off the grid."  The evidence against Defendant is extremely strong, and he is likely to be convicted and face a lengthy prison sentence.  Even with a Criminal History Category of I, the Government estimates that Defendant is facing a sentencing guidelines range of 63-78 months, before the imposition of any upward departures under Section 3A1.4 (Terrorism) or Section 5K2.7 (Disruption of Government Function).

For all of these reasons, the Court can have no confidence that Defendant will appear as required or otherwise follow conditions of release the Court might set.

**Conclusion**

For the above reasons, the Government submits that there is clear and convincing evidence that Defendant is both a flight risk and a danger to the community, and that there is no condition or combination of conditions that will reasonably assure his appearance and the safety of any other person and the community if he were to be released.  The Court should therefore deny his motion.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    /s/ *Robert Juman*
Robert Juman
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov

Date:  January 21, 2022

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading was served on all counsel of record via the Court's electronic filing service.

 /s/   *Robert Juman*
Robert Juman
Assistant United States Attorney

Date:  January 21, 2022