**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NUMBER 21-691** |
| | **:** | |
| | **:** | |
| **CHRISTIAN MATTHEW MANLEY** | **:** | |

<u>**DEFENDANT'S MOTION FOR TRANSFER OF VENUE**</u>

Defendant Christian Matthew Manley respectfully requests that this Court transfer the

instant proceedings, pursuant to his right to trial by an impartial jury under the Fifth and Sixth

Amendments and pursuant to his right to a fair and impartial trial under Federal Rule of Criminal

Procedure 21(a). The detrimental pretrial publicity and community prejudice in Washington D.C.

is so likely to have affected the jury pool that the venire must be presumed tainted.

In the alternative, Mr. Manley requests that this Court permit expanded examination of

prospective jurors before and during formal voir dire.

**WHEREFORE**, for the reasons set forth in the accompanying Memorandum of Law,

Defendant Christian Matthew Manley respectfully moves the Court to grant his Motion and

order that this matter be transferred out of the District of Columbia.

Respectfully submitted,

*/s/ Natasha Taylor-Smith*
NATASHA TAYLOR-SMITH
Assistant Federal Defender

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NUMBER 21-691** |
| | : | |
| | : | |
| **CHRISTIAN MATTHEW MANLEY** | : | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR TRANSFER OF VENUE**

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is so fundamental to Due Process that, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

Christian Matthew Manley, through undersigned counsel, requests that this Court transfer these proceedings to another district because, in the District of Columbia, the prejudice against his defense is so great than an impartial jury cannot be empaneled. This case involves notorious events at the United States Capitol Building on January 6, 2021, events about which much of the public maintains strong opinions. As discussed below, those opinions are especially strong in the District of Columbia, and are so widespread in the District's jury pool that they pose a grave threat to Mr. Manley's right to a fair trial. But Mr. Manley has a right to be tried by a jury that will judge him on the evidence alone, not by preexisting prejudices against those who were present on the Capitol grounds on January 6. A transfer of venue is essential to secure Mr. Manley's constitutional right to a fair trial, because "so great a prejudice against the defendant

exists in [this District] that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

In the alternative, Mr. Manley requests this Court to permit expanded examination of prospective jurors before and during formal voir dire. Specifically, Mr. Manley requests:

1. The defense be allowed to prepare a questionnaire that, after review and approval by the Court, would be distributed to summoned prospective jurors to return before trial;
2. The parties be present for any pre-screening questioning of prospective jurors that the Court conducts before the beginning of formal voir dire;
3. An expanded jury pool;
4. The parties be permitted to question jurors individually during voir dire; and
5. An opportunity for attorney input on the content of the voir dire.

## I.    Background

On January 5, 2021, Mr. Manley traveled to Washington D.C. after hearing then President Trump's call for people to come to the Capitol. On January 6, outfitted with a tactical vest and carrying bear spray, Mr. Manley first attended President Trump's rally, and then proceeded to the Capitol to protest Congress's certification of the electoral vote. As the video evidence shows, Mr. Manley ultimately used the bear spray in a reckless manner, purportedly spraying law enforcement officers. He then retreated.

In response to what the government viewed as terroristic acts at the Capitol, Washington D.C. entered into a state of emergency for more than two weeks. The city's mayor ordered a citywide curfew and discouraged out-of-towners from attending the Presidential Inauguration on January 20 because of road closures and heightened security.[1] Four bridges connecting Virginia

---

[1] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today%E2%80%99spublic-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021),

to D.C. were closed for three days, preventing local DMV travel.[2] Thousands of National

Guardsmen—ultimately, tens of thousands— "streamed into the region" in the days after January

6 and leading up to the Inauguration.[3] Police officers from across the country were sent to D.C.

to assist the National Guard.[4] Following government warnings that "violent extremists" were a

continued threat to the public and to political facilities in D.C., the city continued to see

---

https://www.washingtonian.com /2021/01/11/dc-mayor-says-americansshould-not-come-to-washington-for-the-inauguration/.

[2] Matt Blitz, *Four Bridges Connecting Va. to D.C. Will Be Closed Starting Tuesday*, ARLnow.com (Jan. 15, 2021, 5:45 PM), https://www.arlnow.com/2021/01/15/four-bridges-connecting-va-to-d-c-will-be-closed-starting-tuesday/.

[3] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden inauguration*, The Hill (Jan. 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-forbiden-inauguration.

[4] Katherine Rosenberg-Douglas, *34 Chicago police officers to help keep Washington safe on unprecedented Inauguration Day*, Chicago Tribune (Jan. 19, 2021, 8:03 PM), https://www.chicagotribune.com/news/breaking/ct-chicago-police-in-washington-biden-inauguration-20210120-n3tketsrb5d2jk7rsgaemvicjm-story.html; *Hundreds of local officers sent to Washington D.C. to help with inauguration security*, Wbtv.com, https://www.wbtv.com/2021/01/18/hundreds-local-officers-sent-washington-dc-help-with-inauguration-security/ (last updated Jan. 18, 2021, 5:00 PM); Phil Prazan and Willard Shepard, *South Florida Police Officers Join Effort to Secure D.C. Ahead of Inauguration Day*, NBC 6 South Florida (Jan. 17, 2021), https://www.nbcmiami.com/news/local/south-florida-police-officers-join-effort-to-secure-d-c-ahead-ofinauguration-day/2364747/.

militarized presence into March.[5] Third Street also continued to be sealed off to traffic, affecting

committing and travel.[6]

      Tensions never eased. Over eight months later, in September 2021, a rally near the

Capitol was planned by allies of former President Trump in support of the "political prisoners"

of the January 6 events.[7] In "a city still on edge," local police departments and the United States

National Guard were on standby, and law enforcement erected temporary fencing around the

Capitol and deployed heavy dump trucks to ring the rally site.[8]

      Today, the media ensures the emotional impact of the events of January 6 on D.C.

residents does not subside. *See infra* II.C. The continued language used in news articles, press

---

[5] *National Terrorism Advisory System Bulletin*, Department of Homeland Security (Jan. 27, 2021, 11:00 AM) https://www.dhs.gov/sites/default/files/ntas/alerts/21_0127_ntas-bulletin.pdf; Courtney Pomeroy, *Domestic 'heightened threat environment' prompts Homeland Security terrorism bulletin*, WJLA (Jan. 27, 2021), https://wjla.com/news/nation-world/homeland-security-issues-terrorism-bulletin-for-domestic-heightened-threat-environment; Nick Boykin, *5,000 National Guard troops will stay in DC through mid-March, officials say*, WUSA-TV (Jan. 23, 2021, 8:10 PM), https://www.wusa9.com/article/news/local/dc/national-guard-us-capitol-how-long-will-they-be-there/65-156fa765-acf9-4f67-b87e-d1b5b38a9904.

[6] Mike Valerio, *Barbed wire fence at the Capitol is coming down. But its razor wire will move closer to Congress.*, WUSA9 (March 1, 2021, 6:12 PM), https://www.wusa9.com/article/news/national/capitol-riots/capitol-fencing-comes-down-othis-barriers-stillup/65-b346d31a-40fe-4775-9acf-af9b46d1ba6f.

[7] *See* Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html; Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters; Claudia Grisales, *Capitol Police Are Upping Security Ahead Of A Rally In Support Of The Jan. 6 Rioters*, NPR (September 13, 2021, 5:41 PM), https://www.npr.org/2021/09/13/1036700856/the-u-s-capitol-police-will-reinstall-fencing-ahead-of-a-far-right-rally.

[8] *Id.*

releases, and press conferences—particularly by politicians—sensationalizes the events and demonizes the participants. *See id.* Circulating video clips and recently released documentaries allow D.C. residents to relive the perceived assault on their home. *See id.* The impact of this assault was so great that many—including Vice President Kamala Harris—have compared the events at the Capitol to the terrorist attacks on September 11, 2001. *See infra* II.C.

In *United States v. McVeigh*, the court noted that "[e]xtensive publicity before trial does not, in itself, preclude fairness," as "properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness." 918 F. Supp. 1467, 1473 (W.D. Ok. 1996). However,

> [t]rust in their ability to do so diminishes when the prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome. That is also true when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience.

*Id.* In that case, the court ruled that the "emotional burden" of the event at issue and the community prejudice against the defendants in Oklahoma City was so great that they could not obtain a fair and impartial trial in the state of Oklahoma. *Id.* at 1474.

Such is the case here. Residents of D.C. feel not only a personal stake in the outcome of the January 6 trials, but an obligation to rectify the wrongdoing in their community. The emotional burden residents carry creates a prejudice that cannot be overcome by the Court's instructions.

Charged with civil disorder, assault of certain officers, and various misdemeanor offenses stemming from his actions at the Capitol on January 6, Mr. Manley requests that the Court transfer his criminal proceedings to another district, where the effects on the hearts and minds of the residents will be less than in Washington D.C.

5

## II.     Transfer to another district is necessary for Mr. Manley to receive a fair trial

An impartial jury is required under the Constitution and has been required since the times of common law. *See Patton v. Yount*, 467 U.S. 1025 (1984). "A fair trial in a fair tribunal is a basic requirement of due process," *In re Murchison*, 349 U.S. 133, 136 (1955), a requirement echoed in Federal Rule of Criminal Procedure 21(a), which instructs that district courts "must transfer the proceeding … if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Ordinarily, a trial should be held in, and the jury should be drawn from, "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI. But "if extraordinary local prejudice will prevent a fair trial—a basic requirement of due process"—then "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request." *Skilling*, 561 U.S. at 378 (internal quotation marks omitted). Moreover, in some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton*, 467 U.S. at 1031 (distinguishing between presumed venire bias and actual juror bias). In those "extreme case[s]," a court must presume prejudice because the "trial atmosphere [has been] utterly corrupted by press coverage." *Skilling*, 561 U.S. at 380-81. Unlike "actual prejudice," which only can be confirmed through voir dire, *see id.* at 385–95, presumed prejudice presents a threat to due process that cannot be negated by jurors' voir dire responses, *see id.* at 379; *see also United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012) (Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding).

As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[9] *Skilling*, 561 U.S. at 378.

This is the rare extreme case where a presumption of prejudice necessitates a change of venue. Every potential juror in the District was impacted by the events on Capitol Hill on January 6. The public in this District holds strong opinions, informed and solidified by pervasive new coverage, that are highly prejudicial to Mr. Manley and his defense such that a fair and impartial trial is impossible. Indeed, the presumption of prejudice would override any juror declarations of impartiality during *voir dire* due to the charged nature of this case. *See Skilling*, 561 U.S. at 379; *Quiles-Olivo*, 684 F.3d at 182. Because the hostility of the venue community is so severe and the Due Process concerns so great, a presumption of prejudice mandates transfer of these proceedings. *See* Fed. R. Crim. P. 21(a).

### A. The pool of potential jurors in this District is unusually small and geographically compact, and has been greatly affected by the events of January 6

A district's population size and diversity provide a court with insight into the likely impact of prejudicial media coverage. *See Skilling*, 561 U.S. at 382 ("[W]e have emphasized in prior decisions the size and characteristics of the community in which the crime occurred."). In *Skilling*, the defendant was a former executive at Enron during its notorious accounting scandal,

---

[9] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review: whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt. *See Skilling*, 561 U.S. at 383-84.

and the community was Houston, where "more than 4.5 million individuals eligible for jury duty resided." *Id.* Given the size and diversity of that district, where a significant number of prospective jurors would have had no connection to Enron, the Supreme Court found that this factor militated against a presumption of prejudice.

In contrast to Houston, the District of Columbia is one of the smaller major U.S. cities, with a population of approximately 670,000, and a voting-age population under 550,000.[10] And D.C.'s entire population resides in a space of just 68.34 square miles.[11] With the Capitol Building near the geographic center, all D.C. residents live within 7.5 miles of the site.

The impact of the events of January 6 on this small community of D.C. residents cannot be overstated. Indeed, the community effect was far more widespread than that of Enron in Houston, for a number of reasons.

First, the militarization of Washington D.C. and the restrictions put in place in the wake of the January 6 events greatly impacted residents' day-to-day life. The citywide curfew, closed bridges and roads, and presence of thousands of National Guardsmen and police officers were not just an inconvenience; residents felt under siege. "It feels like Gotham City from the Batman movies where we are kind of on our own, locked in the city here," Washington D.C. resident Andrew Kovacs told NPR. "You know, with the bridges closing out of Virginia, it feels like it's

---

[10] 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545), https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previous-decade; U.S. Census Bureau Quickfacts: District of Columbia, https://www.census.gov/quickfacts/DC (last visited Apr. 29, 2022).

[11] U.S. Census Bureau, District of Columbia: 2010 13 (2012), https://www.census.gov/prod/cen2010 /cph-2-10.pdf#page=33.

just us, and the whole world is watching."[12] Brandon Stryder explained the practical struggles of living inside of a military enclosure, saying, "There's a checkpoint actually set up right by our building. A few nights ago, we were trying to pull our car out to go get groceries and they put a cinder block, blocking the alleyway so we couldn't even exit the parking garage."[13] So inconvenienced, D.C. residents felt that they were being punished for the wrongdoing of the "mob attack on the Capitol."[14] And the punishment continues to reverberate in anticipation of follow-up protests.[15]

Second, a huge proportion of District of Columbia residents work for the federal government and/or have close friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater D.C. area (excluding postal workers, federal bureau of investigation

---

[12] *What It's Like To Live Inside D.C.'s Militarized Security Zone*, NPR (Jan. 19, 2021), https://www.npr.org/local/305/2021/01/19/958311657/what-it-s-like-to-live-inside-d-c-s-militarized-security-zone.

[13] *Id.*

[14] *Residents Resistant To Permanent Capitol Security Fence*, NPR (Feb. 13, 2021), https://www.npr.org/2021/02/13/967704469/residents-resistant-to-permanent-capitol-security-fence.

[15] Colleen Long et al., *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, U.S. News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rallysupporting-jan-6-rioters ("In a city still on edge after the Jan. 6 insurrection, law enforcement bore down in large numbers on the Capitol on Saturday over concerns that a rally in support of the jailed rioters would turn violent."); Billy House and Chris Strohm, *Jan. 6 Anniversary Will Bring Heightened Security to Capitol*, Bloomberg (Jan. 3, 2022), https://www.bloomberg.com/news/articles /2022-01-03/jan-6-anniversary-will-bring-heightened-security-to-capitol (reporting that "Capitol Police, federal and local agencies are beefing up security at the U.S. Capitol complex ahead of this week's anniversary of the Jan. 6 insurrection," and "added police power will be significant and visible").

workers, and staff on several federal commissions).[16] Nearly 200,000 of those workers and

annuitants are within the District itself. *Id*. With a voting-age population under 550,000, any

given member of the District jury pool has a greater likelihood of being closely connected to the

federal government than those in comparable metro areas. In fact, as of 2019, *active* federal

employment (including postal workers) accounts for nearly a third of all jobs in the District.[17]

And of course, for each federal worker, there are many friends and family members who are

closely connected to the federal government by proxy.

The likelihood that prospective jurors will have been directly affected by the events of

January 6, or have connections with individuals or institutions that were affected, is particularly

problematic. Nearly 15,000 individuals work for Congress, and many more residents have

friends and family who do.[18] Another large share are in, or have friends and family in, the many

law enforcement groups who took part in responding to January 6.[19] Due to these close

connections, a majority of District residents are likely to view themselves as direct victims.

---

[16] Federal Civilian Employment, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

[17] Trends in Federal Employment in DC, DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[18] Vital Statistics on Congress, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[19] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. Human Capital Strategic Plan 2021-2025,U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. See Metropolitan Police Force Annual Report 2020, DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.

Jury selection during recent January 6 trials has confirmed the prevalence of connections to the federal government. As noted by one media outlet, the jury pool in the matter of *United States v. Guy Reffit*, Crim. No. 21-32 (D.D.C.), "featured a concentration of lawyers and people who worked for the federal government or had a connection through a family member — an unsurprising situation given the location."[20] Just one panel included a man who "used to work for Democratic Rep. Brad Schneider and had spoken with Schneider about his experience on Jan. 6 being huddled with police at the Capitol," a Department of Defense employee, a "corporate lawyer for Amazon who'd received a tentative offer to work at the Justice Department in the Civil Division," and a former Department of Homeland Security spokesperson, among other individuals connected to the government.[21]

Third, the emotional impact of the January 6 events on D.C. residents was both enormous and immediate, to a degree incomparable in other districts. Even District residents that had no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. As one resident told a reporter on January 7:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door. I've been having a lot of conversations with people this morning, loved ones. We're all

---

pdf ; *see also* About Us, DC National Guard (2020), https://dc.ng.mil/About-Us/; Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html; *More than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since/.

[20] Zoe Tillman, *How Do You Seat a Jan. 6 Jury When Everyone Knows Something About It?*, BuzzFeedNews, Feb. 28, 2022, https://www.buzzfeednews.com/article/zoetillman/jan6-jury-selection-guy-reffitt-capitol-riot.

[21] *Id.*

hurting. We're terrified. We're in shock. And I think it's going to take awhile. This is by far the darkest moment of my 45-year existence.[22]

This resident's reaction captures a communal response throughout the District, echoed in countless media interviews and news coverage. On January 13, a local subsidiary of the national public broadcasting network, *DCist*, reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. [...] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[23]

D.C. resident Yolanda Inchauregui told NPR, "I feel like I'm in a war."[24]

The effects of these events continue to be felt in the District.[25] During jury selection in *Reffitt*, "[m]any potential jurors talked about their experiences on Jan. 6 or about people they

---

[22] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happensthursday-edition-1.5864816/d-c-residentwho-gave-blm-protesters-refuge-condemnsatrocities-at-u-s-capitol-1.5864894.

[23] Jenny Gathright and Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

[24] *What It's Like To Live Inside D.C.'s Militarized Security Zone*, NPR (Jan. 19, 2021), https://www.npr.org/local/305/2021/01/19/958311657/what-it-s-like-to-live-inside-d-c-s-militarized-security-zone.

[25] Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html; Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters; Claudia Grisales, *Capitol Police Are Upping Security Ahead Of A Rally In Support Of The Jan. 6 Rioters*, NPR (September 13, 2021, 5:41 PM), https://www.npr.org/2021/09/13/1036700856/the-u-s-capitol-police-will-reinstall-fencing-ahead-of-a-far-right-rally.

knew who worked at the Capitol or were affected by the attack."[26] One member of the panel, an employee at the Library of Congress, "recalled that employees she had assigned to go into work that day were forced to evacuate or shelter in place."[27] Another member stated, "It would be difficult for me to be neutral," as the events felt like "an attack on my home, in a sense."[28]

Fourth, the government's allegations in this case stoke partisan passions that in this District would be overwhelmingly hostile toward Mr. Manley. In the 2016 presidential election, 95.9% of D.C. voters voted against Donald Trump.[29] In the 2020 presidential election, 94.6% of D.C. voters voted against Donald Trump.[30] The Democratic candidate received more than 90% of the vote in both elections. This astounding lack of political diversity is unique to the jury pool for D.C. Because Mr. Manley is charged with attempting to prevent the certification of the Electoral College results, in effect, he has been charged with seeking to nullify the votes of the majority of D.C. residents, and thus of the venire.

In *United States v. Alford*, this Court found that the District's political views were irrelevant to the change of venue analysis, as "[j]uror's political leanings are not, by themselves, evidence that those jurors cannot fairly and impartially consider the evidence presented and

---

[26] Ryan J. Reilly, *Jury selection in first Jan. 6 trial revives D.C. residents' anger about Capitol attack*, NBCNews, Feb. 28, 2022, https://www.nbcnews.com/politics/justice-department/jury-selection-first-jan-6-trial-revives-dc-residents-anger-capitol-at-rcna17954.

[27] *Id.*

[28] *Id.*

[29] 2016 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2016-General-Election (last visited Oct. 14, 2021).

[30] 2020 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2020-General-Election (last visited Oct. 14, 2021).

apply the law as instructed by the court." *Alford*, Crim. No. 21-263, ECF No. 46, Order at 6 (finding defendant's "assumptions concerning party affiliation" to be "misleading" and "not an appropriate basis for changing venue"). Certainly a juror's party affiliation alone does not create prejudice. But, in this case, the voting history of the D.C. population is particularly relevant. Although this Court noted this information "excludes many potential jurors who may not closely follow politics," *id.*, in fact, as of December 2020, approximately *ninety-four percent* of D.C.'s eligible voters are registered to vote, with approximately 76% registered as Democrats.[31] The percentage of D.C. residents who respond to jury duty, on the other hand, is far less than those who are registered to vote.[32] Thus, far from excluding potential jurors, statistics regarding voting history encompass nearly all of D.C. residents, many of whom do not report for jury duty.

In any event, more significant than party affiliation itself is the anti-Trump sentiment throughout Washington D.C. The animus towards former President Trump is visceral.  During Donald Trump's presidency, large numbers of District residents engaged in protests targeted at Trump and his supporters. Inauguration Day 2016 saw violent protests in the District, with anti-Trump protesters destroying businesses, cars, and other property, and attacking Trump

---

[31] D.C. Board of Elections Monthly Report of Voter Registration Statistics, as of Dec. 31, 202, https://www.dcboe.org/CMSPages/GetFile.aspx?guid=51012afc-bc2c-4a78-84ec-c48cc47f7805

[32] In 2014, "the 'yield rate' in D.C.—the ratio of people who actually show up for jury duty— [was] 22 percent." https://wamu.org/story/15/12/14/why_did_70000_washingtonians_ignore_their_jury_summons_last_year/ (reporting that in 2014, "the D.C. Superior Court sent more than 150,000 jury summonses. Of those, 22,000 were returned as undeliverable — and 70,000 people just didn't respond"). "The national average [was] double that." *Id.*; *see also* Jury Service Revised: Upgrades for the 21st Century, Council for Court Excellence, http://www.courtexcellence.org/uploads/publications/CCE_Jury_Report_Web_Final.pdf (same statistics).

supporters.[33] And D.C. is the birthplace of "The Resistance," a loosely organized movement among left-wing activists who sought to thwart President Trump's executive orders and actions.[34]

Given the electoral makeup of D.C., and the personal and visceral impact of the events of January 6 felt by a great majority of the residents, both "the size and [the] characteristics of the community" lend strong support for a presumption of prejudice that would prevent a fair trial. By helpful way of comparison, the Honorable Shira Scheindlin, district court judge in the Southern District of New York, denied a change of venue request by Osama Awadallah, who had been charged with perjury as a material witness before a grand jury investigating one of the hijackers involved in the September 11, 2001, terrorist attacks. *United States v. Awadallah*, 457 F. Supp. 2d 246, 247-48 (S.D.N.Y. Aug. 2, 2006). In that case, following a mistrial, the parties had evidence of juror bias, as jurors had emotional conversations about their personal experiences of September 11 during their deliberations. *See id.* at 253. Nevertheless, the court found that changing the trial venue from New York City was not the "best way to ensure an impartial jury" for three reasons: (1) there was "no reason to believe that jurors in a different jurisdiction would lack an emotional response with prejudicial effects"; (2) the Second Circuit had cautioned that 'transfer from a metropolitan area to a smaller city may result in more rather than less intensive

---

[33] Gregory Krieg, *Police injured, more than 200 arrested at Trump inauguration protests in DC*, Jan. 21, 2017, CNN, https://www.cnn.com/2017/01/19/politics/trump-inauguration-protests-womens-march/index.html; Maya Rhodan, *Protesters to President Trump: The Resistance Begins Now*, Jan. 20, 2017, TIME, https://time.com/4640946/donald-trump-inauguration-protesters/.

[34] *See* Adam Gabbatt, *100 days of Trump Resistance: the wins so far and battles to come*, Apr. 24, 2017, The Guardian, https://www.theguardian.com/us-news/2017/apr/24/100-days-of-trump-resistance-wins-so-far-battles-to-come; Sarah Jaffe, *The Resistance Begins*, NYTimes, Jan. 20, 2017, https://www.nytimes.com/interactive/projects/cp/opinion/presidential-inauguration-2017.

publicity'; and (3) "the Southern District of New York serves one of the country's most diverse cross-section of ethnicities, backgrounds, and experiences." *Id.* (quoting *United States v. Dioguardi*, 428 F.2d 1033, 1039 (2d Cir.1970)).

All three factors considered by Judge Scheindlin favor transfer here. First, there is every reason to believe that residents of D.C. experienced a greater emotional response to the events at the Capitol, and continue to feel the effects today. The close connection to the federal government of many residents, combined with the state of emergency and persisting tensions throughout the District, strongly suggests the prejudicial effects of emotional reactions in D.C. are higher than in other districts. Second, as stated above, the D.C. is one of the smaller major U.S. cities—20th in population, just larger than Nashville and Oklahoma City.[35] Finally, the prevalence of personal connections to the federal government among D.C. residents, and the political affiliation of the large majority of residents—including strong anti-Trump sentiments— eclipses any demographic diversity to which D.C. may lay claim. As such, pursuant to Judge Scheindlin's analysis, an impartial jury in D.C. cannot be ensured.

**B. Data confirms that the majority of potential jurors in the District of Columbia shares materially prejudicial views of the January 6 defendants as a group**

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for the District of Columbia retained the services of the professionals of Select Litigation to survey the District of Columbia jury pool. *See United States v. Gieswein*, Crim. No. 21-24-1, ECF No. 101. As explained in Exhibit 1, Select Litigation polled 400 potential District of Columbia jurors, and 400 potential jurors in the Atlanta Division of the Northern District of

---

[35] https://en.wikipedia.org/wiki/List_of_United_States_cities_by_population.

Georgia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *See* Ex. 1, with appendices.

Select Litigation's survey confirms that significant majorities of potential jurors in the District of Columbia share materially prejudicial views of the January 6 defendants as a group, including in ways that *voir dire* is not likely to reveal or cure. More specifically, the survey demonstrates that the majority of potential jurors in D.C. have unfavorable impressions of January 6 defendants, have already concluded they are guilty, and have already concluded they had the specific intent to obstruct.[36]

### 1.  D.C. residents have prejudged all January 6 defendants

Exhibit 1 summarizes Select Litigation's findings, but highlights include that District of Columbia residents overwhelmingly:

- Would characterize those individuals arrested for participating in the January 6 demonstrations as "criminals" (62%);
- Have unfavorable opinions of those individuals (84%);
- Would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54% respectively);
- Have already formed the opinion that these individuals are people are "guilty" of the charges brought against them (71%);

---

[36] In *Alford*, this Court found the Select Litigation poll to be an improper means for determining whether District residents are biased because (1) polling lacks safeguards, and may suffer from non-response bias, contain leading questions, or provide respondents with context that influences their responses; (2) respondents are not under oath and there is no opportunity to gauge demeanor and credibility; and (3) whether a prospective juror has previously formed opinions about January 6 defendants is not decisive as to her qualifications. Crim. No. 21-263, Order at 9. Yet *voir dire* in this case will suffer from similar obstacles, as potential jurors will come with preexisting biases, and pointed questions formulated to weed out those biased jurors will be equally leading as in the survey. *See infra* II.E (discussing insufficiency of *voir dire*). And while a juror may not be "disqualified simply because they have formed some impression or opinion as to the merits of the case," *Alford*, ECF No. 46, Order at 9 (citation and internal quotations omitted), as discussed, potential jurors in this District likely have formed strong opinions concerning the events of January 6 that they will not be able to put aside.

- Believe these individuals were trying to overturn the election and keep Donald Trump in power, were insurrectionists, and were trying to overthrow the United States government (85%, 76%, and 72%, respectively).

Ex. 1 ¶¶ 9, 10, 14, 15, 18. Only six percent of residents have a favorable view of those arrested, and three percent have prejudged the defendants as "not guilty". *Id.* ¶ 9. These results indicate that most of the jurors will be predisposed against these defendants, will likely view them as guilty of conduct other than that with which they are charged, and will likely consider them as posing a danger to the community broadly, notwithstanding the strength or weakness of the evidence presented. Indeed, the prejudgment held by D.C. residents against the defendants is striking: 76% of those who stated that they believe the defendants will receive a fair trial think the defendants are guilty, and 56% of them say they would vote "guilty" if they were on a jury. *Id.* ¶ 12.

These trends likely also explain the fact that close to four out of ten D.C. survey respondents would not trust a jury here to give them a fair trial if they themselves were accused of violating the law on January 6th. *See* Ex. 1 ¶ 8 (reporting that only 67% of potential D.C. jurors stated that they believe that they themselves would receive a fair trial if they were defendants in a January 6 case).

### 2.  D.C. residents are particularly unlikely to be impartial

Selection Litigation's study demonstrates that this District is uniquely unlikely to produce an impartial jury, for the reasons discussed *supra*, including the personal impact of the events of January 6 on D.C. residents and the political leanings of residents. *See* Ex. 1 ¶¶ 21-22. Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to the District of Columbia. *See* Ex. 1 ¶ 19-23. The

results show that significantly fewer potential jurors there have set their minds against January 6

defendants. For example:

- 84% of DC survey respondents view people arrested in the wake of January 6th unfavorably, but only 54% of Atlanta division respondents do;
- 71% of DC respondents are of the opinion that these individuals are guilty, but only 54% of Atlanta division respondents share this opinion;
- More than half of DC respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;
- 62% of DC respondents would characterize the January 6 defendants as "criminals," and well over 50% would characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

Ex. 1 ¶¶ 23, 24.

Importantly, evidence suggests that jurors in other districts are more likely to be like the

Atlantans than like D.C. residents. Select Litigation asked both sets of survey respondents to

state whether they associated those who entered the Capitol on January 6 with certain purposes, a

question that had also been asked in a recent national poll conducted by CBS/YouGov. Ex. 1 ¶¶

3, 18, 25.[37] The results show that potential jurors in Atlanta hold prejudicial views on this issue

at similar rates as survey respondents do nationally. *Id.* ¶ 25. But a far greater share of potential

jurors in the District of Columbia hold prejudicial views on this issue.

---

[37] The results of the poll and its methodology is described at
https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view (last visited 4/29/22). As noted in Select Litigation's Report, the firm mirrored the wording of the CBS/YouGov poll as closely as possible to maximize the comparative value, even though Select Litigation would have used different wording. Further, differences in methodology mean the comparison is not perfect. *See* Ex. 1 ¶ 18.

**Comparison of Beliefs among Jury-Eligible Citizens in DC, Atlanta, & Adults Nationwide**
**Do you believe this term would or would not describe the actions of on January 6?**

|  |  | USA | DC | GA |
|---|---|---|---|---|
| Trying to overturn the election and keep Donald Trump in power | Would | 63% | 85% | 68% |
|  | Would not | 37% | 9% | 19% |
| Insurrection | Would | 55% | 76% | 55% |
|  | Would not | 45% | 13% | 27% |
| Trying to overthrow the US govt | Would | 54% | 72% | 57% |
|  | Would not | 46% | 20% | 33% |
| A protest that went too far | Would | 76% | 69% | 70% |
|  | Would not | 24% | 24% | 21% |
| Patriotism | Would | 26% | 13% | 25% |
|  | Would not | 72% | 81% | 63% |
| Defending freedom | Would | 28% | 10% | 21% |
|  | Would not | 72% | 86% | 70% |

*Id.* ¶ 25. In short, the evidence suggests that it is this district that is the national outlier in terms of juror prejudice, not Atlanta.

   **C. Pervasive and persistent media coverage of events at the Capitol on January 6, 2021, and subsequent investigations, create a presumption of prejudice**

   Presumed prejudice may arise from media coverage that "readers or viewers could not reasonably be expected to shut from sight" as jurors. *Skilling*, 561 U.S. at 382. Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court

must presume local prejudice and transfer the proceeding. *Quiles-Olivo*, 684 F.3d at 182; *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182.

But extensive, negative press coverage "does not necessarily violate a defendant's right to a fair trial." *Alford*, Crim. No. 21-263, ECF No. 46, Order at 3 (citing *Skilling*, 561 U.S. at 380). In *Alford*, this Court noted that in *Skilling*, the Supreme Court found that the media attention following the Enron scandal "'did not present the kind of vivid, unforgettable information' likely to produce prejudice.'" *Id.* at 3-4 (quoting *Skilling*, 561 U.S. at 384). Indeed, the *Skilling* Court found the news coverage in that case "largely objective and unemotional," and did not "invite[] prejudgment of [defendant's] culpability." *Id.* at 381-82.

In contrast, the January 6 events at the Capitol have been ascribed once-in-a-generation infamy in media coverage, coverage that has been extensive, subjective, and emotional. Data gathered by News Exposure at the direction of Select Litigation establishes that coverage of January 6 has been extensive and persistent, particularly in the District of Columbia. In the year following January 6, 2021, District of Columbia newspapers published at least 500 articles about the events at the Capitol, and local news syndicates broadcasted over 7000 stories about the day. *See* Ex. 1 at App. B-7 (print data); App. B-1 (broadcast data).[38] This was far greater news coverage than in other parts of the country. For example, a comparison of coverage of January 6 events in D.C. versus in the Atlanta division of the Northern District of Georgia showed that in

---

[38] These estimates may understate coverage of January 6, as News Exposure only counted hits containing a short list of terms: "January 6 riot," "Capitol insurrection," "Capitol riot," "2021 US Capitol attack" or "Capitol violence." News Exposure searched *The Washington Post, The Washington Times*, and *Washington Examiner*.

the month where January 6 was covered least by local D.C. broadcast affiliates (August 2021),

January 6 was still mentioned more than it had been in Atlanta in 9 of the 12 months evaluated.

Ex. 1 ¶ 30; *id.* at App. B-1, B2. The data also shows that District of Columbia print, broadcast,

and web coverage of January 6 has exceeded Atlanta's equivalent's almost every month, and has

far surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every

story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been

at least two in *The Washington Post.* Ex. 1 ¶ 28. The extent of media coverage has been almost

entirely unprecedented, perhaps only comparable to the reporting following September 11.[39]

Parallels to September 11 do not end there. As reported in the Washington Post and the

Washington Times, at a one-year anniversary observance:

> [Vice President Kamala] Harris compared the Jan. 6 insurrection to two other
> dates when the United States came under attack: Dec. 7, 1941, when the Japanese
> bombed Pearl Harbor, and Sept. 11, 2001, when terrorists turned commercial
> airplanes into missiles and attacked the World Trade Center and the Pentagon.

> "Certain dates echo throughout history, including dates that instantly remind all
> who have lived through them where they were and what they were doing when
> our democracy came under assault," Harris said. "Dates that occupy not only a
> place on our calendars but a place in our collective memory."[40]

---

[39] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S.
Capitol on Jan. 6." Views on the Rioting at the US Capitol, Pew Research Center (Jan. 15, 2021),
https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ ;
compare with The War On Terrorism, Pew Research Center (May 23, 2002),
https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/.

[40] Annie Linskey, *Biden goes after Trump for lies and self-aggrandizement in Jan. 6 insurrection
anniversary speech*, WashingtonPost.com (Jan. 6, 2022),
https://www.washingtonpost.com/politics/biden-goes-after-trump-for-lies-and-self-
aggrandizement-in-jan-6-insurrection-anniversaryspeech/2022/01/06/fdb39c14-6eff-11ec-aaa8-
35d1865a6977_story.html; Valerie Richardson, *Republicans accuse Democrats, media of
exploiting Jan. 6 riot*, WashingtonTimes.com (Jan. 6, 2022),
https://www.washingtontimes.com/news/2022/jan/6/republicans-accuse-democrats-media-
exploiting-jan-/.

The Vice President was hardly the first to equate the impact of September 11, 2001 to that of January 6, 2021.[41]

The sensationalism of the news lends to such comparisons. Coverage has relied on gruesome details in click-bait headlines to galvanize the public. Select snippets of photographic and video footage appearing to show the destruction of Capitol property have been repeatedly shown. Vivid images splashed across D.C. papers and television have shown people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on desks in the Capitol, milling about and hanging from the balconies in the Senate Chamber, and appearing to try to break into the House chamber, among hundreds of other scenes.[42] Videos also show distressed officers, many of whom have testified before Congress—testimony that was widely circulated in print and through video.[43]

---

[41] S*ee, e.g.*, David Mastio, *After ousting Liz Cheney, Republicans prove they're a bigger threat than 9/11 hijackers*, USA Today (May 13, 2021), https://www.usatoday.com/story/opinion/voices/2021/05/13/jan-6th-insurrection-greater-danger-democracy-than-9-11-column/5057119001/ ("As surely as the terrorists of 9/11 wanted to tear down American democracy in 2001, the terrorists of Jan. 6 want to tear down our democracy . . . . Yes, 9/11 cost many more lives than Jan. 6 has so far, but comparing the two attacks is reasonable because the Big Lie is more dangerous to our way of life than the 2001 terrorists' medieval ideology ever was.").

[42] *See, e.g.* Staff, "No pictures, no pictures': The enduring images from Jan. 6," *The Washington Post* (Jan. 4, 2022), at https://www.washingtonpost.com/nation/ interactive/2022/photos-jan-6-capitol/ (last visited 2/3/22); "Chilling images from the Capitol riot: Jan. 6 insurrection in photos," *USA Today* (Jan 5. 2022), at https://www. usatoday.com/picture-gallery/news/politics/2022/01/03/jan-6-insurrection-photos-capitol-riot/9052798002/ last visited 2/3/22); D. Bennett, et al., "41 minutes of fear: A video timeline from inside the Capitol siege," *The Washington Post* (Jan. 16, 2021), at https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol -siege/ (last visited 2/3/22).

[43] *See, e.g.*, Police Officers Deliver Emotional Testimony About Violent Day at the Capitol, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/.

The language used in media coverage of the events of January 6 has been especially charged and inflammatory. Reporters and their interviewees, including members of Congress, consistently refer to the defendants as "insurrectionists," "rioters," "seditionists," "domestic terrorists" "white supremacists" and "criminals" in the media.[44] For example, in late January 2021, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists."[45] Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[46] Representative Ayanna Pressley referred to the people involved in the incident as "the white supremacist mob."[47] Indeed, within the first week of the incident, 73% of Democrat leaders in Washington referred to the January 6 event as an "insurrection."[48]  Democrat

---

[44] *See* Ex. 1 (subset of media coverage in summary form); *see, e.g.*, *Analysis: A race war evident long before the Capitol siege*, WTOP, Feb. 5, 2021, https://wtop.com/national/2021/02/analysis-a-race-war-evident-long-before-the-capitol-siege-2/; *Dozens Charged in Capitol Riots Spewed Extremist Rhetoric*, NBC4 Washington, Feb. 16, 2021, https://www.nbcwashington.com/news/nationalinternational/dozens-charged-in-capitol-riots-spewed-extremist-rhetoric/2575102/; *Trump Legacy on Race Shadowed by Divisive Rhetoric, Actions*, NBC4 Washington, Jan. 10, 2021, https://www.nbcwashington.com/news/politics/trump-legacy-on-race-shadowed-by-divisive-rhetoric-actions/2536591/.

[45] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-anexecutive-order-on-racial-equity/.

[46] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/.

[47] *Rep. Pressley: Husband positive for COVID-19 after lockdown*, WTOP, Jan. 13, 2021, https://wtop.com/national/2021/01/rep-pressley-husband-positive-for-covid-19-after-lockdown/.

[48] Lawmakers of each party used distinct language on social media in days following Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-

lawmakers' social media engagement skyrocketed after January 6 as they began heavily discussing the incident.[49] By February, it became second nature for Democrats to describe the incident as an "insurrection" and to refer to Trump supporters as "white supremacists." At his confirmation hearing, Attorney General Merrick Garland pledged to "supervise the prosecution of white supremacists and others who stormed the Capitol on 6 January."[50] Nancy Pelosi went so far as to declare that Donald Trump is an accessory to murder.[51]

Public comments by United States district court judges in the District of Columbia have similarly tainted the jury pool in this District. For example, in comments that were widely reported, a judge stated that "everyone participating in the mob contributed to [the January 6] violence," and went on to conclude that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[52] Such general legal conclusions about January 6 defendants will surely have influenced D.C. residents,

---

tank/2021/01/15/how-lawmakers-social-mediaactivity-changed-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_01/ (last visited Oct. 14, 2021).

[49] Audience engagement with posts from Democratic lawmakers increased after Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-media-activitychanged-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_02/ (last visited Oct. 14, 2021).

[50] Martin Pengelly, *Merrick Garland vows to target white supremacists as attorney general*, The Guardian, Feb. 26, 2021, https://www.theguardian.com/us-news/2021/feb/21/merrick-garland-white-supremacists-attorney-general-senate-judiciary-hearing.

[51] Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murder, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-the-capitol-hill-insurrection-trump-was-anaccessory-to-the-crime-of-murder-99705925960 (last visited Oct. 14, 2021).

[52] 'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions, Politico (Oct. 28, 2021) (emphasis added), https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442.

and could cause jurors to question any jury instructions on the burden of proof and presumption of innocence provided by the Court.

There is no obvious recent example of another event that has drawn media coverage as extensive as the coverage surrounding the events here. The jury pool in this District, especially, will comprise "readers or viewers [who] could not reasonably be expected to shut from sight" what they have read and seen. *Skilling*, 561 U.S. at 382. Under these circumstances, prejudice should be presumed; in fact, prejudice is plainly apparent in the survey responses of the large majority of D.C. residents who already have decided that similarly situated defendants to Mr. Manley are guilty. The extent and tone of media coverage, like D.C.'s size and characteristics, weigh heavily in favor of presumed prejudice.

### D.  The events of January 6, 2021, remain fresh in prospective jurors' minds

In determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting was attenuated. 561 U.S. at 383.

In stark contrast, here, little more than a year has passed, and the reckoning over January 6 continues to generate front-page news. As new information has been gathered, in-depth articles and video analyses about January 6 have appeared in the Washington Post, New York Times, CNN, Vanity Fair, Rolling Stone, and NPR, among many others.[53] The investigation and actions

---

[53] *See, e.g.*, Dan Berman, *The Latest in the Jan. 6 Investigation*, CNN (Nov. 28, 2021), https://www.cnn.com/2021/11/28/politics/january-6-investigation/index.html; *Inside the Capitol Riot: An Exclusive Video Investigation*, N.Y. Times (Nov. 10, 2021),

of a House Select Committee regularly feature prominently in print, television, and internet media. Reporting on the guilty pleas and trials of January 6 defendants appears weekly, if not daily. And even if news coverage has declined some over time, entertainment media has produced new content, including documentaries by several major media companies.[54] For example, HBO released a feature-length documentary, Four Hours at the Capitol, in late October. There is no reason to think that coverage will wane before Mr. Manley's August trial, as the Select Committee continues its investigation and the criminal prosecutions of January 6 defendants progress. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

### E. *Voir Dire* is ineffective in cases of prejudgment based on emotional pretrial publicity

This is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the voir dire an unsatisfactory device for selection of an impartial jury." *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976). Where it attaches, the Supreme Court has recognized that the presumption of prejudice overrides juror declarations of impartiality during

---

https://www.nytimes.com/2021/06/30/us/jan-6-capitol-attack-takeaways.html; Jacqueline Alemany et al., *The Attack*, Washington Post (Sept. 26, 2021), https://www.washingtonpost.com/politics/interactive/2021/jan-6-insurrection-capitol/; Hunter Walker, *The 'JusticeForJ6' Rally Wasn't a Joke — It Was A Warning: support for the Capitol insurrectionists has taken root firmly inside the GOP*, Rolling Stone (Sept. 18, 2021), https://www.rollingstone.com/politics/politics-features/justiceforj6-rally-insurrection-capitol-trump-1228690/; Bess Levin, *January 6 Organizers Threw Back Champagne and Charcuterie as the Capitol Was Attacked*, Vanity Fair (Nov. 22, 2021), https://www.vanityfair.com/news/2021/11/january-6-organizers-text-messages-champagne-charcuterie.

[54] *See, e.g.*, *Four Hours at the Capitol* (HBO 2021), https://www.hbo.com/documentaries/four-hoursat-the-capitol; *24 Hours: Assault on the Capitol* (ABC News 2021), https://www.hulu.com/series/24- hours-assault-on-the-capitol; *Day of Rage* (N.Y. Times 2021), https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

*voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *See Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

While there are cases where the passage of time and thorough *voir dire* may be sufficient to correct for pretrial publicity, particularly sensational publicity cannot be so cured. Of particular importance are the findings from *On the Effectiveness of Voir dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, which found that *voir dire* challenges are insufficient and ineffective at weeding out biased jurors in cases with prejudicial pretrial publicity.[55] In such cases, the "net effect of careful *voir dire* concerning pretrial publicity . . . was nil, and the bias created by the publicity survived *voir dire* unscathed." *Id.* at 697. Furthermore,

---

[55] Kerr, N L, et al., *On the Effectiveness of Voir dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, American University Law Review, vol. 40, no. 2, 1991, pp. 665–701. Summary available at https://www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrial-publicity-empirical.

"emotional publicity"—the kind of sensational publicity likely to arouse an emotional response, *id.* at 665-701—"could not be cured, not even through time and continuances." *Id.* at 675.

Mr. Manley's case is undoubtedly full of emotional pretrial publicity. The unprecedented community prejudice in Washington D.C., the unprecedented amount of political and media commentary, the staggering amount of emotion that charged the 2020 Presidential election, and the emotional socio-political issues at the heart of the publicity surrounding Mr. Manley's case render this case the type of "emotional publicity" case that instills bias into the D.C. venire that cannot be cured. Asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt.

That is apparently the case here. As demonstrated by the Select Litigation survey data, many of the people who expressed confidence that January 6 defendants can obtain a fair trial have unwittingly already prejudged an essential element in the case. That is, 78% of those in the survey who say that they believe the defendants will receive a fair trial also take it as a given that defendants who entered the building were trying to overthrow the government and/or to keep Donald Trump in power. Ex. 1 ¶ 16. And 82% of those who believe defendants can receive a fair trial also believe the term "insurrection" is an apt description for their actions. *Id.* Thus, unless the *voir dire* probes every controversial element of each charged offense (such as whether any conduct directed at law enforcement could possibly have been justified by police misconduct), these results show that *voir dire* cannot be expected to preserve Mr. Manley's right to an impartial jury in this District. The only remedy to cure the prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an alternative venue.

III.  **If the Court were to deny a transfer of venue, then expanded examination of prospective jurors before and during formal voir dire would be crucial to mitigate actual prejudice**

If the Court concludes that prejudice should not be presumed, then the parties' opportunity for expanded examination of prospective jurors is essential for a fair trial. For instance, although the Supreme Court did not find presumed prejudice in *Skilling*, it acknowledged that "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," and noted approvingly that the district court's "extensive screening questionnaire and followup voir dire were well suited to that task." 561 U.S. at 384.

Views prejudicial to Mr. Manley's defense are so widespread in this District's jury pool that empaneling a sufficiently impartial jury might not be possible. But if it *is* possible, such a jury could be identified only through expanded examination that allows the parties a thorough opportunity to explore individual prejudices. To accomplish that, Mr. Manley would ask the Court to permit: (1) a Court-approved questionnaire to be sent to summoned prospective jurors; (2) the right for the parties to be present during any pre-screening questioning the Court conducts before formal voir dire; (3) an expanded jury pool; (4) individual questioning during voir dire; and (5) an opportunity for attorney input on the content of the voir dire. *See Awadallah*, 457 F. Supp. 2d at 254 (providing for a similar process for jury selection).

IV.  **Conclusion**

The unique circumstances of January 6 and its aftermath, the small size of the District of Columbia and the political leanings of its residents, and the ongoing and sensationalized news coverage of the events make this venue unlikely to produce an impartial jury as the Constitution demands. Data confirms that there are extremely high levels of prejudice among potential jurors

in this District; most potential jurors here have already made up their minds that the January 6

defendants are criminals, that they are generally guilty, and that they are specifically guilty of

seeking to stop the counting of the electoral votes. As a result, even those striving to be honest

during *voir dire*, and striving to meet their obligations as jurors, would nevertheless remain

partial in ways that *voir dire* could not reveal. Under these extreme circumstances, prejudice

must be presumed, and the Court should transfer this case to another venue to preserve Mr.

Manley's constitutional rights of due process and a fair trial by an impartial jury, pursuant to

Federal Rule of Criminal Procedure 21. In the alternative, Mr. Manley requests that the Court

allow expanded questioning of prospective jurors as set forth above.


Respectfully submitted,


*/s/ Natasha Taylor-Smith*
NATASHA TAYLOR-SMITH
Assistant Federal Defender

**<u>CERTIFICATE OF SERVICE</u>**

I, Natasha Taylor-Smith, Assistant Federal Defender, Federal Community Defender

Office for the Eastern District of Pennsylvania, hereby certify that I caused a copy of the

foregoing Defendant's Motion for Transfer of Venue to be served by Electronic Case Filing

("ECF") upon Robert Craig Juman, Assistant United States Attorney, United States Attorney's

Office, 500 E. Broward Blvd., Ft. Lauderdale, FL 33132, and Zachary Phillips, Assistant United

States Attorney, United States Attorney's Office, 1801 California Street, Suite 1600, Denver, CO

80202.


*/s/ Natasha Taylor-Smith*
NATASHA TAYLOR-SMITH
Assistant Federal Defender


DATE:          July 18, 2022