**UNITED STATES DISTRICT COURT**
**FOR THE DISTICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-691 (TSC)** |
| **CHRISTIAN MATTHEW MANLEY,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christian Matthew Manley to 57 months' incarceration, at the mid-point of the applicable guideline range of 51 to 63 months, 3 years supervised release, a $100 special assessment and $2,000 restitution.

**INTRODUCTION**

The defendant, Christian Matthew Manley, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Manley, a former United States Marine, joined the storming of the Capitol at the Lower West Terrace ("LWT") and assault on officers at the LWT tunnel. Manley was one of the first rioters to arrive at the LWT, at approximately 2:45 p.m., wearing a flak jacket, armed with two cans of bear spray and a collapsible police baton, and carrying handcuffs.  After preparing himself by retrieving bear spray from his backpack, Manley moved directly to the tunnel where, within less than ten minutes, he sprayed both cans of bear spray at officers, helped pass stolen police shields to other rioters, threw a pipe towards officers, and wedged his body between a wall and door so that he could push the door into officers trying to secure the tunnel.

The government recommends that the Court sentence Manley to 57 months' incarceration, 3 years supervised release, $100 special assessment and $2,000 restitution.  A 57-month sentence reflects the gravity of Manley's conduct and the need to deter Manley and others from future acts of political violence.

## I.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 39, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the

2

most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well

as patrolling throughout the grounds.  At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Image 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Image 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Image 1, pushing against the barricade there.





*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.





*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up

onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.





*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with

glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.



*Image 5: LWT tunnel*

This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Image 6: "Inauguration at the U.S. Capitol", located at https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at

the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

### B.      Christian Manley's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Manley, a less than honorably discharged former Marine, participated in the January 6 attack on the Capitol. His crimes are documented through a number of body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol.

Manley drove from Alabama to Washington, D.C. on January 5, 2021, accompanied by a friend and his friend's 17-year-old son.  Manley and his companions first met up with a group of people in South Carolina who were also headed to the "Stop the Steal" rally.  The group traveled in a convoy of six or seven vehicles to Washington D.C.  Once in Washington, D.C., Manley and his two friends split from the convoy and stayed in a hotel.

On January 6, 2021, Manley made his way to the Ellipse along with his two friends. Manley and his friends listened to former President Trump's speech and then headed to the U. S. Capitol as a result of Former President Trump's references to the Capitol in his speech.

Manley arrived at the west side of the Capitol shortly after the West Plaza was overrun by rioters. He climbed up to the LWT, while his two friends stayed behind.

***Lower West Terrace and Tunnel***

At approximately 2:45 p.m., Manley arrived at the LWT, armed with two cans of bear deterrent/pepper spray, a collapsible police baton and handcuffs.  Upon reaching the LWT, Manley immediately took out the baton and extended it, then repeatedly struck the floor with the baton, apparently testing its durability. *See* Exhibit 1 at :30. After taking video of the crowd below with his cellphone, Manley removed his backpack and appeared to rummage through it. *Id*. at 1:56. Manley put the backpack back on, and held up both arms, now holding a cannister of pepper spray in his right hand. *Id*. at 3:18.



*Image 7: Screenshot from Exhibit 1 at 3:20*



*Image 8: Screenshot from Exhibit 2 at :01 (baton circled in red)*

Before he approached the tunnel, and from his various positions at the LWT, Manley saw rioters attacking the officers defending the archway with, among other things, baseball bats, pepper spray, riot shields, and poles.

At approximately 2:53 p.m., Manley moved directly toward the archway of the tunnel. Upon entering the archway, Manley had the bear deterrent/pepper spray in his left hand and then moved it to his right hand. Manley sprayed the bear deterrent/pepper spray toward the officers defending the tunnel. *See* Exhibit 3. In Image 9 below, Manley (circled in red) can be seen spraying the bear deterrent/pepper spray.

13



*Image 9: Screenshot from Exhibit 3 at 1:02*

Having emptied the contents of the cannister, Manley threw it at the officers protecting the LWT. *See* Exhibit 3 at 1:09.

Manley next moved back to the archway, where he assisted in passing stolen police shields away from the officers and to other rioters. *See* Exhibit 4 at :19 - :44. While passing one of the shields to other rioters, Manley turned to rioters outside the tunnel and encouraged them, yelling, "let's go!" *Id.* at :28.

At approximately 2:55 p.m., Manley once again moved inside the tunnel, and sprayed officers with bear deterrent/pepper spray for a second time. While Manley sprayed, other rioters

were also attacking officers by throwing objects at them.  In Exhibit 3, Manley (circled in red) can

be seen spraying officers a second time.



*Image 10: Screenshot from Exhibit 3 at 2:30*

Once again, having emptied the second cannister of bear deterrent/pepper spray at the

officers, Manley threw it at them. *See* Exhibit 3, at 2:56.  Manley remained in the tunnel, and

took a pipe from another rioter, which he also threw at officers.  *Id.* at 3:31.



*Image 11: Screenshot from Exhibit 3 at 3:31*

Manley kept moving forward, towards the officers trying to defend the tunnel. By approximately 2:57 p.m., rioters had pushed the police back to the inner doors inside the tunnel, and Manley was at the front line of the rioters confronting the police. Taking advantage of the fact that the inner doors swung out, towards the mouth of the tunnel, Manley positioned himself behind one of the inner doors, wedged his body between the wall and the door, and used the full strength of his body to push the door against the officers on the other side, forcing them further inside the Capitol. *See* Exhibit 5.



*Image 12: Screenshot from Exhibit 5 at :27*

Despite Manley's efforts, officers were successful in pushing the rioters back towards the entrance. As the officers moved forward, Manley exited the tunnel, leaving at approximately 2:59 p.m. *See* Exhibit 3, at 6:57. As he exited, Manley wiped his eyes from the obvious effects of chemical spray. *See* Exhibit 6, at 5:55. Manley then walked down the stairs leading to the tunnel, waving his arms and encouraging other rioters to enter the tunnel. *See* Exhibit 7 at :20.

### *Manley's Post Arrest Statement – October, 2021*

Manley was arrested in Alaska on October 21, 2021 and agreed to speak with law enforcement. While he admitted certain aspects, he also tried to minimize his conduct. For example, he admitted to having been in Washington, D.C. for the rally on January 6, 2021, and that he was "amped up" as he made his way to the Capitol. He claimed he brought the flak vest, extendable baton, handcuffs and bear spray for defensive purposes.

Manley admitted that once he arrived at the Capitol, he saw tear gas being deployed by law enforcement. Manley claimed that he nevertheless continued towards the LWT because he wanted to protect "soccer moms" and "older women and men" from getting hurt.

Manley admitted being in the LWT tunnel for approximately 5 – 10 minutes, but falsely claimed that during that time, he was yelling at rioters to stop.  He also claimed that he used the bear spray, not just against officers, but to subdue other rioters in front of him. Manley admitted throwing the empty cannisters of bear spray and helping to pass the stolen riot shields out of the tunnel.

### Manley's Post Arrest Statement – February 2023

Manley met with FBI agents for a second time on February 27, 2023.  During this interview, Manley was truthful and forthcoming.  Manley admitted that he sprayed bear spray at officers, passed riot shields to other rioters, and threw a pipe at officers.   Manley also admitted to pushing the door against officers while inside the tunnel.  Manley also expressed remorse for his actions on January 6, 2021.

### THE CHARGES AND PLEA AGREEMENT

On November 19, 2021, a federal grand jury returned an Indictment charging Manley with 8 counts, including Count Three: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 United States Code, sections 111(a) and (b).  On December 12, 2021, Manley was convicted of Count Three based on a guilty plea entered pursuant to a plea agreement.

## II.      STATUTORY PENALTIES

Manley now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 United States Code, sections 111(a) and (b).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## III.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Government's calculations are as follow:

Count Three: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 United States Code, sections 111(a) and (b).

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Violation of 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **26** |
| U.S.S.G. §3E1.1 | Acceptance of Responsibility | -3 |
| **Total Adjusted Offense Level:** | | **23** |

*See* Plea Agreement at ¶¶ 5(A).

The draft PSR includes one adjustment not contemplated by the government in the plea agreement.  The draft PSR includes a two-point enhancement pursuant USSG §2A2.2(b)(1) because the assault involved more than minimal planning to wit: the defendant, a former U.S.

Marine, arrived at the U.S. Capitol in a flak jacket and armed with two cans of bear repellent/pepper spray (which he deployed), a retractable baton, and handcuffs, all illustrating a level of preparation for and anticipation of participating in an assault.  Based on the plea agreement, the Government is not seeking this enhancement, but submits that the underlying facts are relevant to the court's determination of where within the agreed guideline range Manley should be sentenced.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 47. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 23, Manley's Guidelines imprisonment range is 51 to 63 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## IV.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Christian Manley's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Manley was an active participant in the riot, one of the first rioters to enter the LWT tunnel, and one of the earliest to attack the officers with a dangerous weapon. Manley sprayed two cans of bear spray at officers, helped pass stolen riot

shields to other rioters, threw a pipe at officers, wedged his body between a wall and door to push the door into officers, and encouraged other rioters to enter the tunnel. The nature and circumstances of Manley's offense were of the utmost seriousness, and fully support the government's recommended sentence of 57 months' incarceration, 3 years supervised release, $100 special assessment and $2,000 restitution.

### B.  The History and Characteristics of the Defendant

The defendant is a former Marine who received a less than honorable discharge from the Marine Corps.  Manley has a history of drug and alcohol abuse through his own admissions as well as captured in his criminal history which includes a DWI conviction from 2017.  In the months leading up to January 6, 2021, Manley was somewhat homeless and often stayed with friends.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Manley's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although the defendant has now expressed remorse and contrition, his remorse did not come upon leaving the Capitol. Manley's remorse did not become apparent until he met with agents in February of 2023. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Julian Elie Khater,* 21-cr-00222, Judge Thomas Hogan sentenced a defendant also convicted of assault on federal officers with a dangerous weapon.  Khater, like Manley, was actively involved in the assault on officers in the LWT tunnel.  Like Manley, Khater came to the Capitol armed with bear spray which Khater did not use. However, Khater also came armed with hand-held pepper spray which Khater did use in the same manner that Manley used in the tunnel.

Also comparable is this Court's sentence in *United States v. Robert Scott Palmer*, 21-cr-328, which is similar yet less aggravating than the actions of Manley.  Similar to Manley, Palmer threw objects at officers in the tunnel.  Additionally, Palmer sprayed officers with a fire extinguisher. However, Manley's use of bear spray is more aggravating than the spray of a fire extinguisher. Additionally, Manley came armed with his bear spray, where Palmer had to scavenge for the objects he used to assault officers in the tunnel.  However, a mitigating factor for Manley is that Manley has demonstrated acceptance of responsibility where Palmer did no such thing.  This court sentenced Palmer to 63 months' incarceration, 36 months' supervised release, and $2,000

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

25

restitution. Balancing the aggravating and mitigating factors between Manley and Palmer, a sentence of 57 months' incarceration is an appropriate sentence for Manley.

## V.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[5] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Manley must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Manley played in the riot on January 6.[6] Plea Agreement at

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881.360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in October 2022. Restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 111.

## VI.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' incarceration, 3 years supervised release, $100 special assessment and $2,000 restitution.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052


By:     */s/ Zachary Phillips*
ZACHARY PHILLIPS
Assistant United States Attorney
CO Bar No. 31251
Capitol Riot Detail
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (720) 281-1611
Zachary.phillips@usdoj.gov