UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .   CR No. 21-0691 (TSC)
                               .
     v.                        .
                               .
CHRISTIAN MATTHEW MANLEY,      .   Washington, D.C.
                               .   Tuesday, April 25, 2023
          Defendant.           .   10:19 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          ZACHARY PHILLIPS, AUSA
                             U.S. Attorney's Office
                             1801 California Street
                             Suite 1600
                             Denver, CO 80202
                             (303) 454-0100


For Defendant:               NICHOLAS G. MADIOU, ESQ.
                             MICHAEL E. LAWLOR, ESQ.
                             Brennan McKenna & Lawlor
                             6305 Ivy Lane
                             Suite 700
                             Greenbelt, MD 20770
                             (301) 474-0044


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

PROCEEDINGS

THE DEPUTY CLERK:  Your Honor, we have criminal action 21-691, United States of America versus Christian Manley.  We have Mr. Zachary Phillips representing the government and Mr. Michael Lawlor and Mr. Nicholas Madiou representing Mr. Manley, all appearing in person.  And we also have Ms. Crystal Lustig representing Probation.

THE COURT:  Good morning.  Both of you here today.  That's big-time.  You're tag-teaming me today; it's usually just one at a time.

All right.  Good morning, everyone.  We are here for the sentencing of Mr. Manley, who has pleaded guilty to one count of assaulting, resisting, or impeding certain officers using a dangerous weapon in violation of 18 U.S.C. § 111(a) and (b).

In preparation for this sentencing, I have received and reviewed the following materials:  The plea agreement that was signed by Mr. Manley, sentencing memoranda and seven video exhibits from the government, and sentencing memoranda from the defense as well as a letter from Mr. Manley.  I've reviewed all of these documents.  Am I missing anything, Mr. Phillips?

MR. PHILLIPS:  No, Your Honor.

THE COURT:  Mr. Madiou?

MR. MADIOU:  No, Your Honor.

THE COURT:  Are you expecting a witness?  Are you

1       planning on playing anything?

2               MR. PHILLIPS:  No, Your Honor.  I submitted that stuff

3       in the hopes that the Court would be able to review it.

4               THE COURT:  I did.  All right.  Thank you.

5           So let me begin with the presentence report.  The final

6       presentence report and sentencing recommendation were filed on

7       April 18, 2023.  The probation office added a two-point

8       enhancement to the total offense level because its assessment

9       was that the assault involved more than minimal planning

10      pursuant to Sentencing Guidelines § 2A2.2(b)(1).

11          The government and the defense in negotiating the plea

12      agreement did not factor in this enhancement and the

13      government is not asking for the enhancement to be applied.

14          While I think that the probation office's calculation and

15      assessment that this enhancement applies is warranted, in

16      other words, it's not -- in my opinion I don't disagree with

17      their assessment, I'm not going to add it.  Because I believe,

18      first of all, he is getting an enhancement for I believe the

19      weapons, carrying those objects, and I try if I can to stay

20      true to the spirit of the agreement reached with the parties,

21      because you all negotiated this, I was not part of it, I am

22      not part of it, I didn't investigate the case, I don't

23      represent the defendant.  And if the opinion of the government

24      is that that is the deal that was negotiated and it's

25      obviously the opinion of the defense, I'm not going to add

1    that enhancement unless there were circumstances that I

2    believe really warrant it, and I don't believe those

3    circumstances exist here.

4         So while I believe -- and I want to make it clear for

5    probation that probation was doing their job in assessing this

6    enhancement, I'm not going to apply it.

7         Okay.  The plea agreement initially contemplated that

8    Mr. Manley would have two criminal history points based on two

9    prior convictions.  But where it states in the presentence

10   report that he has two criminal points, that was based on what

11   was in the plea agreement.  The government notes -- well, the

12   presentence report notes that only one of those convictions

13   could be proven for purposes of criminal history points, and

14   so they only have one criminal history point.

15        The government notes in its sentencing memorandum the same

16   thing, which was although the parties contemplated that -- let

17   me find it.  Right.  Right.  Says the probation office

18   calculated defendant's criminal history as a Category I, which

19   is not disputed.  And then they came up with an imprisonment

20   range of 51 to 63 months.  Maybe I'm mistaken.  Was it in the

21   government memorandum or the defense memorandum that conceded

22   that one of those couldn't be proven?

23        MR. PHILLIPS:  I think I can clarify this.  Originally

24   when we negotiated the plea agreement and did the plea

25   agreement we believed the defendant was going to be a criminal

1    history II.  The documentation for that has --

2            THE COURT:  Right.

3            MR. PHILLIPS:  -- unable to be completed and provided

4    to the probation and/or defense and as such we believe that

5    it's now criminal history No. 1.

6            THE COURT:  You're right, and I was right but had the

7    wrong document.  It's the defense memo.  On page 3 the defense

8    memo says:  The parties anticipated an additional criminal

9    history point for a possible 2018 summary court-martial, but

10   that conviction has not been confirmed.  It does not appear in

11   NCIC.  So everybody agrees with only -- he only has one

12   criminal history point which puts him in criminal history

13   category I.  Right?  We're all on the same page?

14           MR. MADIOU:  Yes, Your Honor.

15           MR. PHILLIPS:  Yes, Your Honor.

16           THE COURT:  So, Mr. Manley, you may remember I told you

17   at your plea that I was not bound by what was in the plea

18   agreement, that this was just your attorneys' estimation, and

19   sometimes my final calculation will be higher or lower.  In

20   this case, it's lower.  So that's one of the things I warned

21   you about.

22      So there's no objection to the criminal history -- one

23   criminal history point, criminal history category I.  Is that

24   right?

25           MR. PHILLIPS:  Yes, Your Honor.

1          THE COURT:  Okay.  In which case, I'll go through now

2     step by step the guidelines calculations and then we'll end up

3     with a range.

4          The presentence report lays out the probation office's

5     calculation of the advisory guideline range, and it was done

6     using the 2021 guidelines manual, and is as follows:

7     Beginning with the guidelines offense level, the applicable

8     guideline in this case is sentencing guideline § 2A2.2(a),

9     which has a base offense level of 14.  Because a dangerous

10    weapon was used, that is the bear repellant, pepper spray, the

11    canisters and a pipe, or retractable baton, the offense level

12    is increased by four, and that's the reason why I decided not

13    to give the additional enhancement for the planning.  Even

14    though as I said, I agree it could be reasonable to assess it,

15    I did not.

16         Mr. Manley was convicted under 18 U.S.C. § 111(b),

17    therefore, the offense level is increased by two.  Because

18    there is an official victim, the offense level is increased by

19    six.  And the government has also represented that Mr. Manley

20    has demonstrated acceptance of responsibility in a manner that

21    entitles him to a two-level reduction under § 3E1.1(a), and

22    that Mr. Manley assisted authorities in the investigation and

23    prosecution of this matter in a manner that entitles him to an

24    additional one-level reduction under § 3E1.1(b).  Therefore,

25    before I consider any departures or variances, Mr. Manley's

1    total offense level is 23.  Are there any objections to that

2    calculation?  Mr. Phillips?

3              MR. PHILLIPS:  No, Your Honor.

4              MR. MADIOU:  No, Your Honor.

5              THE COURT:  All right.  So turning to the -- we've

6    already discussed the applicable criminal history.  The

7    parties are all agreed and the Court agrees that Mr. Manley

8    has one prior conviction that receives criminal history

9    points, and that conviction gives him a subtotal of 1, which

10   puts him in criminal history category I.  Any objections,

11   Mr. Phillips?

12             MR. PHILLIPS:  No, Your Honor.

13             MR. MADIOU:  No, Your Honor.

14             THE COURT:  Based on the offense level and the criminal

15   history category I've just discussed, I calculate that the

16   guidelines sentencing range in this case is 46 to 57 months of

17   imprisonment.  Any objection to that calculation?

18             MR. PHILLIPS:  No, Your Honor.

19             MR. MADIOU:  No, Your Honor.

20             THE COURT:  Okay.  And again, Mr. Manley, that is

21   actually lower than what was in your plea agreement, because

22   your plea agreement had an estimated guideline range of 51 to

23   63 months, but because of the lower criminal history points,

24   we're now looking at 46 to 57 months.

25       Okay.  So sometimes my estimation is higher, sometimes it's

1    lower.  In your case it's lower.

2         Now, having determined the applicable guidelines range, the

3    next step is for me to consider departures.  Presentence

4    report doesn't include any departure grounds, and under the

5    terms of the plea agreement, both parties have agreed that

6    there are no grounds for imposing a sentence outside of the

7    guidelines range that is based on policy statements in the

8    manual.  Is that correct, Mr. Phillips, Mr. Madiou?

9         MR. PHILLIPS:  Yes, Your Honor.

10        MR. MADIOU:  Yes, Your Honor.  There is a request to --

11        THE COURT:  Right.

12        MR. MADIOU:  -- address the sealed portion but we don't

13   anticipate -- there are no departures.

14        THE COURT:  Right.  So Mr. Manley argues in his

15   sentencing memorandum that the Court should vary downward from

16   the guideline range because of certain factors.  And I'll

17   provide the parties with an opportunity to address that in a

18   little bit.

19        Now, with regard to the statutory framework, § 3553

20   requires me to consider a number of factors including the

21   statutory penalties that the guidelines prescribe, and the

22   sentencing range which I've just discussed.

23        With regard to the statutory penalties, the charge of

24   assaulting, resisting, or impeding certain officers using a

25   dangerous weapon in violation of 18 U.S.C. § 111(a) and (b)

1    carries a statutory maximum penalty of 20 years of

2    imprisonment.  There's no mandatory minimum.  And the

3    defendant is eligible for one to five years' probation because

4    the offense is a Class C felony.

5         If a term of imprisonment is imposed, the statutes provide

6    that Mr. Manley faces a supervised release range following

7    imprisonment of not more than three years, while under the

8    guideline range, that is one to three years.  And the statute

9    of conviction sets a maximum fine of up to $250,000, while the

10   guidelines fine range is between $20,000 and $200,000.

11        There's a special assessment of $100 that is mandatory to

12   the Clerk of the Court of the District of Columbia, and

13   pursuant to his plea agreement Mr. Manley must pay $2,000 in

14   restitution to the Architect of the Capitol to help offset the

15   damage done to the Capitol as a result of the riots.

16        Counsel, have I stated accurately the statutory and

17   guideline framework that we're operating under?  Mr. Phillips.

18             MR. PHILLIPS:  Yes, Your Honor.

19             MR. MADIOU:  Yes, Your Honor.

20             THE COURT:  As you all know, because I authorized it to

21   be disclosed, the probation office has recommended 64 months

22   of incarceration and 36 months of supervised release.  The

23   recommendation of the probation office is not based on any

24   facts or circumstances that haven't been already revealed to

25   the parties in the presentence report.

1    I just wanted to let you know because I always do this.

2    Whenever I meet with Probation prior to a sentencing, I

3    disclose the contents of that discussion on the record because

4    I think -- it's what I prefer to do.  I had a brief discussion

5    with the probation officer this morning just to confirm my

6    calculation and our calculation of the criminal history

7    points.  And that was the substance of the discussion.

8    Okay.  So at this point, having set forth my calculation of

9    the applicable criminal history category as well as the

10   sentencing guideline range, I will give the parties an

11   opportunity to address the Court.  Mr. Phillips?

12   MR. MADIOU:  Your Honor, would it be the Court's

13   preference to take care of the brief sealed portion?

14   THE COURT:  Oh, yeah.  Let's do that now.  You want to

15   put it under seal or -- let's put this portion under seal.

16   MR. MADIOU:  Thank you, Your Honor.

17   PROCEEDINGS UNDER SEAL













```
1   ████████████████████████████████████████████
2   ████████████████████████████████████████████
3   ████████████████████████████████████
4   ██████████████████████████████████████████
5     ████████████████████████████████████████
6   ██████████████████████████████████████████████
7   █████████████████████████████████████████
8   ████████████████████████████████████████████████
9   ████████████████████
```

                          OPEN PROCEEDINGS

          THE COURT:  Okay.  We can go back on the record.

       Okay.  Mr. Phillips?

       (Discussion off the record.)

          MR. PHILLIPS:  Your Honor, I know that we talked about

    this earlier.  You've had the opportunity to view our

    exhibits.  And I guess at this time I'd move to admit

    Government Exhibits 1 through 6 or 7, or whatever -- I think

    it was --

          THE COURT:  Why don't you just say all the proffered

    exhibits.

          MR. PHILLIPS:  Yeah.  1 through 7.

          THE COURT:  Any objection?

          MR. MADIOU:  No objection.

          THE COURT:  They'll be admitted.

```
 1                         (Government Exhibit Nos. 1-7
 2                           received into evidence.)
 3            MR. PHILLIPS:  Your Honor, just briefly, since the
 4       Court is well aware and has been able to see the government
 5       exhibit as well as the sentencing memo, taking in all of the
 6       considerations and much of which we've discussed this morning,
 7       both the defendant's preparation and coming to the Capitol
 8       with the things he came with -- although we did not seek that
 9       enhancement, that is information we considered in our
10       recommendation to the Court -- as well as the fact that we
11       believed he was a criminal history II and may or may not be,
12       although he's not today certainly because there's not the
13       evidence to prove it, but also that defendant's actions during
14       January 6 and since January 6, 2021, ultimately we are going
15       to continue to maintain our recommendation of 57 months.
16            That gets us at the top end of where the Court has
17       calculated the guidelines for today, or the bottom end had
18       probation's calculations been considered.  It's that kind of
19       sweet spot where the defendant was.
20            We've talked, at least I have, briefly, some of the
21       defendant's remorse and so forth since January 6, 2021.  But
22       I do want to take the Court back to his actions on January 6,
23       2021.  This was a man who arrived at the Capitol with a flak
24       jacket, with blue lives matter, or a blue lives flag or
25       something of that nature, which is kind of ironic given his
```

1   conduct on that day, as well as a police collapsible baton,

2   handcuffs, and two cans of bear spray.

3       And in a 10-minute period he gets to the Lower West

4   Terrace, tests out the baton and then puts it back in his

5   pack, then goes and gets the --

6       (Discussion off the record.)

7       -- and after testing his baton went into his backpack, got

8   a can of bear spray, and immediately made his way to the Lower

9   West Terrace tunnel, which I know the Court is well aware of.

10  He enters the tunnel quickly and sprays his entire can of bear

11  spray and throws it towards the officers, and spraying the

12  bear spray to the officers.  Moves to the back part of the

13  tunnel and then assists in passing shields out that have been

14  taken from the officers, and encourages others to enter into

15  the tunnel.

16      He then makes his way back into the tunnel, near the front,

17  again sprays a second can of bear spray towards officers,

18  throws that can of bear spray at the officers, briefly exits

19  the tunnel, and then makes his way back in the tunnel, throws

20  some sort of rod or pole or something of that nature that's

21  handed to him at the officers, and then makes his way to the

22  very front of the tunnel where he braces his body between a

23  wall and the glass doors and uses that brace of the wall to

24  push against the officers, where ultimately I think, maybe

25  good for the defendant but certainly good for law enforcement,

1  as he's exiting it's clear that he's been sprayed with pepper

2  spray himself, and stops him from his activities that day, or

3  at least forces him out of the tunnel and he doesn't go back

4  in.  But in a 10-minute period he was extremely active in the

5  assault on officers.

6      We don't have specific officers to testify today that could

7  remember him.  As that was a battle over a period of hours,

8  officers received numerous assaults by numerous defendants.

9  But we do know that certainly, and defense isn't challenging

10  this, that Mr. Manley was very active in that assault.

11  Although for a short period of time, he was a major aggressor

12  and was very active in that assault, and as such, we believe a

13  sentence of 57 months as well as our other recommendations is

14  appropriate in this case.

15          THE COURT:  Thank you, Mr. Phillips.

16          MR. PHILLIPS:  Thank you, Your Honor.

17          THE COURT:  Mr. Madiou?

18          MR. MADIOU:  Thank you, Your Honor.

19      Your Honor, Mr. Manley appeared before the Court in

20  December and pled guilty to assaulting officers with a

21  dangerous weapon.  While I'm here today asking the Court to

22  vary downward from the applicable guideline range, I think

23  Mr. Manley more than anyone else recognizes how serious his

24  actions were that day.  I know from having many, many

25  conversations with him, he's mortified thinking about his

1    conduct that day, because this is a former United States

2    Marine.

3            THE COURT:  And I'm afraid not the only one I've had

4    in front of me.

5            MR. MADIOU:  I'll address that too, in terms of --

6    you know, whether that's aggravating or mitigating, I think

7    it's a discussion worth having, Your Honor.

8       But Mr. Manley I know feels an incredible amount of

9    remorse.  As I said, he's mortified as he thinks back on his

10   conduct that day, and he feels shame.  But I think the very

11   fact that he spent the last 18 months grappling with this

12   makes him just a different person than many of the individuals

13   that stand before the Court.

14      And so I do want to -- and my comments today sort of track

15   chronologically with his life because I think it's really

16   important context to help the Court understand why Mr. Manley

17   made his way to the Capitol on January 6.  But I did want to

18   address just how serious this case is.  There's no part of us

19   that is disagreeing with anything that Mr. Phillips said.

20   This is certainly one of the more serious cases that involve

21   assaulting police officers.

22      And nevertheless, Your Honor, we believe that a sentence

23   below the guideline range is sufficient but not greater than

24   necessary to achieve justice in this case, for several

25   reasons.  I laid this out in detail in our sentencing

memorandum, but Mr. Manley comes before the Court with a
really tragic upbringing.  His parents split when he was very,
very young.  He lived with his mother for the first
approximately 10 years of his life.  His mother was a nurse by
trade but suffered from a crippling drug addiction to the
point where she was never able to take care of Mr. Manley.
Mr. Manley was in the care -- in the same home as his mother
but he was in the care of her parents.

And even as a young child, it was clear to Mr. Manley that
his mother had crippling substance abuse issues to the point
where she couldn't provide for him in any way.  Didn't say
that she loved him, wasn't there to tuck him in bed at night,
would go weeks on end without being home.  So I think what is
a lifetime of mental health issues began very, very early on
in his life.

He was eventually removed from his mother's home, following
her first of many overdoses, and he was placed in the care of
his father.  His father is a veteran, just like Mr. Manley.
And his father provided him a home that was certainly
different but no less tragic.

He went to live with his father at the age of 12.  His
father was an extreme disciplinarian.  He too suffered from
substance abuse issues.  He was an extreme alcoholic, and the
way that played out was just that the slightest of any
transgression as a child would result in physical, verbal,

1     and mental abuse to a young Mr. Manley.

2          He was petrified in his own home.  He literally did not

3     go a night without being afraid that his father would lash

4     out at him for the smallest of infractions.  And this is a

5     sort of continuation of the anxiety and the depression that

6     would linger throughout his childhood and into his adulthood.

7          And so he gets to the point when he's 18 years old, he

8     graduates from high school, and two days later he enlists in

9     the United States Marine Corps.  He did that I think in a

10    certain degree as an 18-year-old seeking to serve the country,

11    but I think equally as important to him was simply a way to

12    get out of where he grew up and away from what was extremely

13    traumatizing years growing up in Alabama.

14         So he enlists, Your Honor, he serves in the United States

15    Marine Corps, he goes through basic training and he's deployed

16    throughout the Middle East.  He does the tour.  In many ways,

17    he thrived as a Marine.  I think he found a greater purpose,

18    he found a group that worked together, and I think he thrived

19    in a lot of ways.

20         But up until that point, Your Honor, his mental health

21    issues had never gone addressed.  He came into the Marine

22    Corps with a lifetime of anxiety and depression.  And I think

23    the mentality of the Marine Corps and the culture of the

24    Marine Corps was both a good thing and a very bad thing for

25    him.  Because what happened as he progressed -- again, I mean

he -- he was rising in the ranks.  He was a corporal at his highest rank.  When he came back from his deployments, he served in the specialized unit, the Chemical Biological Incident Response Force in Indian Head, Maryland.

But all the while, he started developing substance abuse issues like his mother and his father, to the point when he was looking to sign up for a second four-year contract, he was then, at 22 years old, battling himself with extreme alcoholism.  It led to his less than honorable discharge, and then over the course of several years, when he gets back to the United States and civilian life, he really spiraled out of control.

And so what developed was someone who is in constant need of mental health relief, but is not getting mental health treatment, is turning to substance abuse.  So it progressed from alcoholism to Mr. Manley consuming every known narcotic there is --

THE COURT:  And then some.

MR. MADIOU:  -- in a way to try to get immediate relief, but again, the cycle just sort of ate him up.  So he travels the country, trying to make ends meet, working odd jobs, but really living day-to-day, trying to find a way to get relief for what is this severe, severe substance abuse and mental health crisis, which is this revolving door.

Your Honor, the lead-up to January 6 I think is a snapshot

1     of Mr. Manley at his absolute lowest point.  He talks in his
2     letter and in many conversations with me as someone that was
3     never interested in politics, ever.  But as he began
4     spiralling out of control with his mental health and his
5     substance abuse issues, we all know the rhetoric that
6     surrounded the events of January 6, 2021, but even before
7     then, all of us see the bombardment of disinformation.  And
8     for the first time in his life, he's convinced that there is
9     this problem that he's called upon to get involved in.

10         I think as he thinks about it now, it's just hard to
11    explain how he could get there.  But I think the context of
12    how he got there is critically important.  This is someone
13    again who served the country.  And I think ultimately that
14    should be a mitigating factor.  It's easy to say you should
15    know better, you were called upon to serve the country, this
16    is the antithesis of serving your country, this is an attack
17    on it.

18         But someone who is in the lowest of mental states who is
19    constantly inebriated found himself on his way to the Capitol
20    on January 6 with genuinely held political beliefs.  And
21    again, the man who stands before you here today is
22    disillusioned with that.  I know the Court has had an
23    opportunity to review his letter.

24         I honestly think the letter that was written by Mr. Manley
25    says more than I could ever say to the Court.  I think it's

the product of someone who has used the last 18 months to
engage in genuine self-reflection.  And I think, simply put,
he's in a position now, he's housed with nothing but January 6
defendants, and I believe in my heart of hearts that this is
an individual that can make the biggest change.

This court is called upon to impose a sentence that meets
many goals: promote respect for the law, act as deterrence.
But I think a sentence below the guideline range can promote
respect for the law because of how Mr. Manley has responded to
this and his history and characteristics and what led him to
this point.

This is someone who is not shy about calling out that
which he was disillusioned about.  You know, this is not the
right cause, and it's putting him in a position when he's
incarcerated where, you know, he's not -- he's not looked upon
by some of his January 6 defendants in a kind way.  And I
think that sends -- it should send this court the message that
this is someone that has atoned, done everything he can to
atone for the conduct that day, and has really used this
opportunity, which is the lowest point of his life, as a
springboard to something much, much different.

Your Honor, I think the Court can tell a lot about an
individual in terms of any risk of recidivism by the way they
respond to the case.  And this is not somebody who's standing
in front of the Court apologetic because he knows he got

1   caught and he knows you're about to impose a prison sentence.

2   This is someone who has thought about this deeply, who now

3   sits before the Court with 18-plus months of sobriety,

4   something he hasn't had and was forced upon him during his

5   incarceration, but it has given him the opportunity to change

6   his life.  I think -- he said it himself, and I'll take his

7   words:  His arrest was both the best and worst day of his

8   life.  I think it was the culmination of what had gotten him

9   there and that was the worst part.  But the being forced to

10   own his sobriety has given him the opportunity to reflect on

11   his life.

12       Notwithstanding the seriousness of his offense conduct, I

13   believe really strongly in Mr. Manley and I believe that he is

14   a good man who endured immense trauma growing up, and somebody

15   who served his country, fell into crippling mental health and

16   substance abuse, but has used all of this I think to put

17   himself in a better position today.

18       And I know Mr. Manley wants to address the Court.  He's

19   written a letter to Your Honor.  But what I'm asking the Court

20   to do is to look at this case in the totality of

21   circumstances.  His conduct is incredibly serious.  But I

22   think Mr. Manley is situated so much different than other

23   January 6 defendants, both in terms of his history and

24   characteristics and what he's endured, but most importantly

25   how he's responded to this case.

1    And when I say that he can make a big difference, I believe

2    that because of what he's doing currently as he's housed with

3    other January 6 clients.  He talks in his letter about the

4    dangers of misinformation and the dangers of going down the

5    path that is this toxic rhetoric.  And I think as someone who

6    has put himself in the worst of positions, his words will

7    probably resonate way more than anyone else, and I believe

8    that he can make a positive difference, and I believe that he

9    is making a positive difference, Your Honor.

10    Contrition is one thing, but as you're incarcerated with

11    other January 6 defendants, if you can stand up and say, no,

12    this is not right, you know, I think it goes a long way.

13    Your Honor, so for those reasons we respectfully ask for a

14    sentence below the guidelines of 46 months.  And I will

15    address Mr. Manley but I know he intends to address the Court

16    before Your Honor imposes sentence.

17    THE COURT:  All right.  Mr. Manley, I've read your

18    letter, but I told you at your plea and I'll tell you again

19    that you have an absolute right to come up and tell me

20    whatever you want me to hear.  So this is your chance if you'd

21    like to.

22    THE DEFENDANT:  Yes, ma'am.

23    THE COURT:  Come on up.

24    (Discussion off the record.)

25    THE COURT:  Go ahead, Mr. Manley.

1          THE DEFENDANT:  Your Honor, good morning.

2          THE COURT:  Good morning.

3          THE DEFENDANT:  I appreciate the opportunity to address

4    you face-to-face.  And I'd like you to see the more human side

5    of me during this.  That's why I wanted to take my mask off

6    especially.  I want to start by acknowledging how unfortunate,

7    how chaotic, and how unnecessary these events were on

8    January 6.

9          I want to do what any adult should do when they've wronged

10   someone and deeply regretfully apologize for my actions.  I'm

11   ashamed that I took part in the incitement of violence.  I

12   made things so much worse for everyone there when I should

13   have been a peacekeeper.  This is not me.  This is unbecoming

14   of the man I wish to be.  And again, I'm truly sorry for

15   anyone that I affected negatively this day.

16         As I look back at my actions and what led me to do what

17   I did, it just deeply saddens me.  I'm kind of shaking just

18   thinking about it and hearing about it again.  For my entire

19   life I have tried very hard to overcome these immense

20   challenges.  My upbringing was extremely difficult.  At an

21   early age I was abandoned by my mother who suffered from

22   intense crippling drug addiction.  And I felt lost without a

23   mother.  And the pain of abandonment was made worse by her

24   tragic and untimely death.

25         I grew up with a military father who suffered from his own

unaddressed mental health issues.  He was, is, and always will
be an honorable service member, but life under his care was
emotionally abusive, very mentally taxing.  If you chip away
enough at an iceberg, eventually it crumbles, and that's what
I felt like over the years.  I never felt comfortable at home.
I constantly lived in fear, in a state of anxiety.  It took an
intense toll on my mental health.

    At the age of 18, two days after my high school graduation
I enlisted in the United States Marine Corps and I sought a
life of service to my country.  In many ways I thrived in my
service and I had an admirable purpose.  I belonged and I felt
very proud of what I was doing.  I was truly passionate about
serving this amazing country.  And amazing it is.  I love this
country more than anything.

    During my service, however, I also developed extremely
unhealthy coping mechanisms, and the environment of the
United States Marine Corps exasperated my preexisting mental
health issues.  I became an alcoholic, I became very suicidal,
and as my mental health rapidly declined, so too did my need
for relief through substance abuse.

    Following my discharge from the Marine Corps, I fell into a
catastrophic substance abuse, and my mental health just
spiralled out of control.  There was no stopping it.  I could
see no end in sight.  I sought treatment during my last months
as a Marine.  I was in a state of constant mental anguish.

1    Every day just felt like the end of the world, and I wanted it
2    to be the end of my world more than anything, because I was
3    just so tired of the constant anguish.

4        I thought about committing suicide with regularity, and I'm
5    embarrassed to say that I've made attempts at taking my own
6    life on several occasions.  I think back on times when I had
7    the barrel of a loaded gun in my mouth, and the taste is
8    something you never forget.

9        I think back on times when I would get intoxicated and
10   purposely wreck my truck into stationary objects, just hoping
11   for the love of God this would finally be the one time that
12   kills me.  The intensity of my depression, anxiety, and
13   suicidal ideations was only ever temporarily eased through
14   substance abuse.  It was nothing but a Band-Aid, of course.

15       My substance abuse became out of control.  And for these
16   reasons, the lead-up to January 6, 2021, is a blur.  It feels
17   like a surreal nightmare, like a dream.  It's, you know, it's
18   hard to think about.  And I had never been in a lower place
19   in my life.  I had never been interested in politics a single
20   day in my life, and I was just so desperate for a direction,
21   like a cause to grasp onto and feel worthy of being alive,
22   basically.

23       So all of a sudden I'm going to the nation's capital with,
24   at the time, genuinely held political beliefs.  I was under
25   the mistaken impression that my intentions were righteous.

1    And I was of course wrong, dead wrong.

2        The day of my arrest was both the best and worst day of my

3    life paradoxically.  And as I read this letter to you today,

4    I'm so very proud of myself for how far I've come and what

5    I've been able to accomplish with my own mental health.  I

6    have come so far from where I was on that day and the day of

7    my arrest.

8        I have been so deeply sad and pessimistic and insecure for

9    most of my life, as long as I can remember, and at the surface

10   it took the form of narcissism and arrogance which prevented

11   me from ever developing healthy relationships.

12       Awareness is step one to solving any problem, and I'm very

13   grateful for this opportunity to look deep inside myself and

14   figure out why I've been broken for so long.  And I thank God

15   every single day for this opportunity to grow and learn myself

16   and really reconstruct and rewire my perspective on life.  I

17   was going down the wrong path and incarceration saved my life.

18       And as remorseful as I feel and as utterly stupid as my

19   actions were on this day, I can't help but to imagine where I

20   would be today if I had not been arrested.  This incident was

21   a very painful, very intense catalyst that has seemingly

22   propelled me in the right direction.  I've never felt so calm

23   and level-minded.  This experience has had a profound dimming

24   effect on my unhealthy ego, and it's taught me a very valuable

25   lesson, to be very, very careful who you receive your

1    information from.

2        The media-induced outrage in this country, at least in my

3    own lifetime, has never been so out of control.  It is so

4    important for all of us, liberal, conservative, libertarian,

5    Christian, Muslim, it doesn't matter, we have to stay

6    vigilant.  January 6 is a prime example of how widely believed

7    lies and deception can cause chaos and pain for so many

8    people.  It is high time for us all to take a deep breath and

9    just reflect on who we are, why we are here, and where we're

10   going as a country together.

11       Your Honor, there is an absolute zero percent chance that I

12   will ever be involved in anything like this ever again.  I

13   have learned a very hard lesson and have made leaps and bounds

14   with my mental health and sobriety.  My perspective on life

15   has completely changed.  Positivity and love are at the

16   forefront of my mind for the first time in my life.

17       I feel so much closer to God and so much closer to my

18   family.  And no matter what happens today, no matter what you

19   decide, I am excited and I look forward to taking on life with

20   this new attitude and this brand-new fresh perspective and

21   sobriety.

22       As difficult as this experience has been, I have only it to

23   thank for this amazing change in my life.  Thank you so much

24   for listening to me.  I really appreciate it.  This comes from

25   the heart.  I've been looking forward to this day for a long

1    time.  Thank you.

2              THE COURT:  You're welcome.  Thank you, Mr. Manley.

3         Okay.  Well, prosecutor's done his job, your lawyer's

4    done -- your lawyers have done their job.  You have spoken,

5    and you seem to have accepted responsibility.  Now it's my

6    job.  And this is -- it's no secret that I consider this the

7    worst part of my job and the hardest part, but the part I take

8    most seriously.

9         It is easy for people who do not work in the criminal

10   justice system to read about crimes and read about offenders

11   and say, you know, lock 'em all up, hang 'em, whatever.  But

12   those of us who have worked in the trenches for years -- and I

13   was a public defender for years before I became a -- in

14   private practice before I became a judge -- know that it's

15   much more complex, and that everybody who was at that Capitol

16   on the 6th has a story.  And I try and view every individual

17   charged both in January 6 cases as well as any case as

18   individuals before me.

19        And what you find if you work in this field long enough

20   is that people are complicated.  And they do things under a

21   particular combination of pressure and stress and family

22   background and trauma that they might never otherwise do.

23   Your story is no different.  Every January 6 defendant that

24   has come in front of me has had a particular combination of

25   pressures that caused them to take the action that they did.

 1     And I try very, very hard, as I'm doing in this case, to view

 2     each person individually.

 3         And I'm glad that -- I'm glad that the situation and the

 4     conditions at CTF have improved, but in a way I'm almost sorry

 5     you have not had a chance to meet some of the regular people

 6     that normally appear in front of me in this city, charged with

 7     crimes like guns and drugs and robbery, that come before me,

 8     because they also have difficult stories.

 9         I -- one of the things that January 6 did was expose the

10     real divisions, the real cracks in our country in terms of

11     what people believe and how they approach political

12     differences.  And the reason that you and the people who were

13     there that day could spray bear spray on those police officers

14     who were just doing their job, who could scream about, you

15     know, hanging people and deface the Capitol and do the things

16     they did, was because you lose sight of the common humanity of

17     the people on the other side.

18         And your story is a really -- it is a terrible one.  I

19     cannot tell you how many people that you would probably never

20     believe you have anything in common with have come up in

21     similar situations.  And it is a large reason of why people

22     are self-medicating and why they're engaging in antisocial and

23     violent behavior, because they're dealing with past trauma, as

24     you have been your whole life.  And it cuts across race,

25     religion, social class, gender.  I'm a judge.  I'm not a

1    social worker, I'm not a legislator, I'm not a politician.  I

2    deal with the end result.  And it's frustrating often to have

3    to do that.

4        But what you dealt with growing up, no child should have to

5    deal with, and you're still dealing with the consequences of

6    that.  And you always will be.

7        I believe your remorse is genuine.  I believe your

8    commitment to change your life is sincere.  The question is

9    what are you going to do when you get out.  Because you're

10   going to get out.  You're going to get out sooner rather than

11   later.  And you're a young person.  And the one thing I'm

12   going to tell you is it's easier almost in prison to focus on

13   your rehabilitation and your learning and your growth.

14       But when you get out there and you've got to find a job,

15   and you're back to dealing with the same temptations and the

16   same -- you're right back in the same situations that caused

17   the stress and caused the drinking and caused the substance

18   abuse, then you're really going to be tested.

19       So I don't doubt your remorse.  But what I want you to

20   understand is the reason you were able to do the things you

21   did on the 6th is because you stopped seeing other people who

22   differed from you in their beliefs as human and as worthy of

23   your respect.  Those police officers -- imagine.  Some of

24   them, I've heard testify and come into my courtroom, they were

25   in their 20s.  Some of them hadn't been on the job very long.

1    They were completely under-prepared and overwhelmed and they

2    were trying to do their jobs, and they were worried if they

3    were going to see their kids again.  They're suffering from

4    posttraumatic stress disorder.  Some of them have had to

5    retire.  Some of them have permanent injuries.  Some people

6    committed suicide.

7        And those are patriots.  Those people, those people inside

8    the Capitol trying to do their jobs, those police officers

9    trying valiantly to keep the Capitol safe are the patriots.

10       You now have been in a system where you have lawyers

11   working for you, you have prosecutors who are doing their job,

12   I'm doing my job, marshals are doing their job, probation, all

13   these people who you've been surrounded with are also

14   patriots.  They may have different beliefs from you, but their

15   love of their country is no different from yours.  And that

16   failure to see their humanity is one of the reasons why you

17   ended up doing what you did.

18       Your lawyer's right.  He was very eloquent, and so are you.

19   You took an oath to defend the Constitution.  Not to defend a

20   particular side or a particular person, to defend the

21   Constitution.  And you more than anybody knew that you were

22   fighting in that tunnel against sworn law enforcement

23   officers.  That's what you had come to.  And so I do hold you

24   to a higher standard.

25       On the other hand, I see, like so many other people who

were there, that the structure and the camaraderie and the
community that you found in the military, you seem to have
found in common cause with the people you were with on
January 6.  It was almost like you were in the military in a
wartime situation again and your goal is clear and the job
is -- and it's a shame because that couldn't have been further
from the case.

   You were searching for some kind of cause.  And what you
need to be careful about is when you get out, that you don't
go searching again and fall in with the wrong group or the
wrong cause.

   It pains me to hear you say that this was the best thing
that ever happened to you.  Jail should not be the best thing
that ever happened to any person in this country.  But
sometimes it is.  And that's really unfortunate.  But you've
made the most of it, and I give you credit for taking this
time to look within yourself and examine your thinking.

   And I believe you have changed.  I'm happy to hear that
your relationship with your father is on the mend.  Seems that
this was a wake-up call for him as well as for you.  And I
hope it continues.  If you've ever -- I don't know if you've
ever heard of a book called The Great Santini, but if you've
never heard of it or read it, you should read it.  It's about
a young man who grew up with an extremely authoritarian
military father.  You might find it interesting.

1       But the point is, I'm -- I've been riffing, but I'm going

2   back to the 3553 factors.  The seriousness of the offense.  I

3   mean, have you seen the videos of yourself?

4           THE DEFENDANT:  Yes, ma'am.  It's appalling.

5           THE COURT:  Imagine being on the receiving end of all

6   of that.  I've seen -- I can't tell you how many times I've

7   seen those videos, and every single time, I'm shocked, and I

8   tense up, and my blood pressure rises.  And I wasn't even

9   there.  It was like no other day in this country's history.

10      And so I can't emphasize the seriousness of the offense and

11  the need for deterrence, not only for you but for anybody

12  who's ever thinking of doing such a thing again, there has to

13  be an understanding that participating, taking up arms against

14  law enforcement, taking up arms to basically try and overthrow

15  the government, is going to be met with severe punishment.

16  That's my position.  And I try and tailor that punishment to

17  the individual and to the actions that you took.

18      But the actions you took on that day are serious.  The

19  baton, the two canisters of bear spray, the encouragement of

20  other people, the battling in the tunnel, the passing the riot

21  shields.  Those riot shields were all that were keeping some

22  officers from losing their lives, and the protesters were

23  passing them back over their heads like they were trophies,

24  leaving those officers defenseless.  Like it was some kind of

25  a sporting event.

1          I have also considered the need to avoid unwarranted

2     disparity.  I've looked into the relevant statistics.  I've

3     often said and I still believe that the nature of the crimes

4     on January 6 are of such a unique nature that I compare

5     defendants in those cases amongst each other.  And I've looked

6     at other individuals charged with similar cases and the

7     sentences that they received.

8          And I'll say that, Mr. Madiou, I hear your request for a

9     variance.  I do.  But I just don't think this case, despite

10    Mr. Manley's obvious remorse, ███████████████████████████████

11    ██████████████████████████████████████, I just don't

12    think this is a case that warrants a variance.  I will say,

13    though, that under the original plea agreement, the range

14    contemplated by the parties was 51 to 63 months.  The

15    government is asking for 57 months.  The actual range that

16    I've arrived at is lower than that contemplated in the plea

17    agreement at 46 to 57 months.  And then probation's asking for

18    64 months.

19         Taking into consideration Mr. Manley's obvious remorse, his

20    previous service to the government, I do believe that a

21    sentence at the low end of the range is appropriate.  And in

22    fact the sentence that I'm going to impose would have been a

23    variance under the original plea agreement.  It may be cutting

24    this too fine, but I think that -- that's where I come out.

25         Could you stand, Mr. Manley?

1              THE DEFENDANT:  Yes, ma'am.

2              THE COURT:  Having considered all the factors in

3      Section 3553(a), it is the judgment of the Court that a

4      penalty of 50 months is sufficient but not greater than

5      necessary to reflect the seriousness of the instant offense,

6      to promote deterrence, to protect the public from future

7      crimes that you may commit, and to avoid unwarranted

8      disparity.  Therefore it is the judgment of the court that

9      you, Christian Manley, are hereby committed to the custody of

10     the Bureau of Prisons for a term of 50 months on Count 3 of

11     the indictment.  You are sentenced to serve 36 months, that is

12     three years, of supervised release, and to pay a $100 special

13     assessment and $2,000 in restitution.

14         The Court finds that you do not have the ability to pay a

15     fine and therefore waives imposition of a fine in this case.

16     The special assessment is immediately payable to the Clerk of

17     the Court for the U.S. District Court of the District of

18     Columbia.  Within 30 days of any change of address you shall

19     notify the Clerk of the Court of the change until such time as

20     the financial obligation is paid in full.

21         The one --

22              MR. MADIOU:  Your Honor?

23              THE COURT:  Yes.

24              MR. MADIOU:  Your Honor, if I understand -- I heard

25     the Court's sentence.  I was slightly confused.  The Court

1    said that you're going to sentence him at the bottom of the

2    range, which was 46 months.

3         THE COURT:  Well, not -- I'm going to sentence him a

4    month lower than the range that the plea had contemplated.  I

5    am not going to sentence him all the way at the bottom of 46

6    months.  This is the compromise I've come to of 50 months.

7    And it's obviously less than the government and probation's

8    asking for.

9         Mr. Manley, the most important thing that you can do is to

10   keep your sobriety and keep your mental health treatment

11   going.  I'm going to impose conditions of supervised release,

12   and I'm going to impose things that I want you to do while in

13   prison, but the most important thing is when you get out, in

14   addition to whatever conditions probation gives you, you've

15   got to find a meeting.

16       You can't do it on your own, okay?  You have to stay sober.

17   You have too much addiction on both sides of your family.  You

18   see where it took you and where it has led you.  You cannot,

19   you cannot for a minute -- you have to be vigilant with your

20   sobriety for the rest of your life.

21       While incarcerated, I recommend that you participate in

22   an occupational education program designed to help inmates

23   acquire marketable skills in a wide variety of trades.  This

24   will help you in your rehabilitation when you are released.

25   I am also recommending that you participate in a drug abuse

1    education program which is designed to encourage inmates with

2    a history of drug use to review the consequences of their

3    choice to use drugs and the physical, social and psychological

4    impacts of this choice.

5        I'm going to recommend that you enroll in a program within

6    the Bureau of Prisons for drug abuse because that may also

7    assist you in being released early.  Some of the programs have

8    an opportunity to be released early if you're participating in

9    the program.

10       And also I recommend that you participate in the Federal

11   Prisons Industries Program which seeks to reduce recidivism

12   and curb the rising costs of corrections through a work

13   program in which inmates are hired through waiting lists and

14   is available at various institutions through the Bureau of

15   Prisons.

16       RDAP is what I'm recommending, which is residential drug

17   abuse program.  And also if that's not available, a

18   nonresidential drug abuse program.  Basically, any kind of

19   drug abuse program that's available to you, you need to take

20   it.  On supervised -- I know you want to say something,

21   Mr. Madiou, and I'm going to ask about a recommendation for

22   a facility in a minute.  But let me just get through the

23   supervised release conditions.

24       While on supervised release, you must not commit another

25   federal, state, or local crime, you must not unlawfully

1    possess a controlled substance -- and marijuana is a federally

2    controlled substance no matter where else it's legal

3    statewide.  You must refrain from any unlawful use of a

4    controlled substance.  You must submit to a drug test within

5    15 days of placement on probation, and at least two periodic

6    drug tests thereafter.  And you must pay any special

7    assessment, which is $100, as well as the $2,000 in

8    restitution.

9        You must notify the Court of any material change in your

10   economic circumstances that might affect your ability to pay

11   your restitution or special assessment.  You must cooperate in

12   the collection of DNA as directed by the probation office, and

13   you must make restitution in accordance with the law.

14       The discretionary conditions of release are as follows:

15       You must submit to substance abuse testing to determine if

16   you've used a prohibited substance.  You must not attempt to

17   obstruct or tamper with the testing methods.  You must

18   participate in an inpatient and/or outpatient substance abuse

19   treatment program and follow the rules and regulations of the

20   program.  The probation officer will supervise your

21   participation in the program.

22       You must participate in a mental health treatment program

23   and follow the rules and regulations of the program.  Again,

24   the probation officer in consultation with the treatment

25   provider will supervise your participation in the program.

1    Probation office shall release the presentence

2    investigation report to all appropriate agencies in order to

3    execute the sentence of the Court.  Treatment agencies shall

4    return the presentence report to the probation office upon

5    Mr. Manley's completion or termination from treatment.

6        Mr. Manley, pursuant to 18 U.S.C. § 3742 you have a right

7    to appeal the sentence I've imposed, subject to certain rights

8    of appeal you waived as part of your plea.  If you choose to

9    appeal you must file an appeal within 14 days after I enter

10   judgment.  And if you are unable to afford the cost of an

11   appeal, you may request permission from the Court to file an

12   appeal without cost to you.

13       Mr. Phillips, the government pledged to dismiss the

14   remaining counts of the indictment.  Does the government wish

15   to do so now?

16            MR. PHILLIPS:  Yes, Your Honor.  We move to dismiss

17   the remaining counts.

18            THE COURT:  All right.  Those counts will be dismissed.

19       And Mr. Madiou, do you -- and probation, I'm going to come

20   to you in a minute about conditions of supervised release, but

21   do you have a request for a recommendation?

22            MR. LAWLOR:  Yes, Your Honor.

23            THE COURT:  Mr. Lawlor.

24            MR. LAWLOR:  Just trying to earn my keep.

25       So, Your Honor, Mr. Manley is from Florida.  So there are

1    two facilities that have RDAP in the panhandle.  One is a

2    prison camp, which is Pensacola, and the other is an FCI which

3    is Tallahassee.  So I would ask you to recommend both because

4    I don't know which security level he'll be designated at.  So

5    one or the other.

6         THE COURT:  I will.  I'll recommend to the Bureau of

7    Prisons that Mr. Manley be housed at either the Pensacola camp

8    or FCI Tallahassee.

9       Mr. Manley, I don't have any authority over the Bureau of

10   Prisons.  I really wish I did, but I don't.  And I can just

11   make a recommendation and hope they will follow.

12      Ms. Lustig, are you asking for supervision to be

13   transferred of his supervised release?  I'm going to keep

14   jurisdiction of the case.

15        PROBATION OFFICER:  So after -- when he's released

16   from BOP, wherever he determines he's going to live, his

17   supervision will automatically be directly transferred.  If

18   you're going to retain jurisdiction, then there's nothing

19   else you need to do.

20        THE COURT:  If you violate the conditions of your

21   release, you're going to see me, and I don't want to see

22   you like that.  I won't be happy.  Don't make me unhappy.

23        THE DEFENDANT:  I don't want to see you again either,

24   Your Honor.

25        THE COURT:  Oh, you can always walk through those doors

1    and wave hello.  D.C. is actually a really nice city and it's

2    filled with -- it's not a swamp.  It's actually filled with

3    people who also love their country.  Come back another time as

4    a tourist.

5         But I want to tell you seriously, there's another book I'll

6    recommend.  It's called Just Mercy by a man named Bryan

7    Stevenson.  And what he says is -- and I say this all the time

8    and I believe it every time -- that you are not the worst

9    thing you've ever done.  This is one thing that you have done

10   in what's going to probably be a long life, and you've done

11   things you can be proud of and you've done things you can't be

12   proud of.

13        But what determines the content of your character is how

14   you move forward from this, what your family and your friends

15   see you do, how you pick yourself up and move forward in your

16   life.  Whether you're going to be consumed by bitterness and

17   addiction or whether you're going to -- armed with what you

18   have suffered, resolve to make a better life for yourself.

19        And I think that you have the capacity -- not everybody has

20   the capacity for self-reflection, but I think you do.  I

21   really think you do.  You've shown it to me.  You don't have

22   anything else to prove to me or anybody else.  But for your

23   own self, you know, you don't want to be mired in that kind of

24   pain anymore.  It's not worth it.

25        So I believe you have the ability to do it.  And now again,

1    unfortunately, because you are in the federal system, there

2    are resources available to you.  You are going to have the

3    opportunity for some mental health treatment that you may not

4    have had before, for substance abuse treatment that you may

5    not have had before, because of the federal system.  Use it.

6    You can't do it by yourself.  Use it.

7        Good luck to you, sir.

8            THE DEFENDANT:  Thank you very much, Your Honor.

9            THE COURT:  All right.  Thank you.

10        (Proceedings adjourned at 11:31 a.m.)

\* \* \* \* \* \*

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne